Charles Wayne JOHNSON,
Plaintiff–Appellant,

v.

Hal MELTZER, M.D.; Lawrence F. Marshall, M.D.; and University of California at San Diego Medical Center; Jeffrey Lierly, CHP Officer; P.G. Herrera; D. Elgin, CHP Officer; and R.W. Visconti, Sheriff's Deputy, Defendants–Appellees.

No. 95–56404.

United States Court of Appeals,
Ninth Circuit.

Submitted Jan. 9, 1998. *

Decided Jan. 27, 1998.

---

* The panel unanimously finds this case suitable for submission on the record and briefs and without oral argument. Fed. R.App. P. 34(a); Ninth Circuit Rule 34–4.

Before: LAY **, GOODWIN and REINHARDT, Circuit Judges.

GOODWIN, Circuit Judge:

Charles Johnson appeals the summary judgment that terminated his 42 U.S.C. § 1983 action against all defendants for the administration of an experimental drug without his consent. Because he raised issues of material fact sufficient to preclude summary judgment against all defendants except P.G. Herrera, we reverse and remand.

### Facts and Procedural Background

Johnson is a California state prisoner. While driving a stolen car the wrong way on a freeway in an attempt to evade arrest, he crashed into another car and killed the driver. Suffering severe head injuries of his own, he was taken to UCSD where he was initially seen by Dr. James Davis, the trauma attending physician. Someone administered a paralytic agent to immobilize him; he was intubated and hyperventilated in an effort to prevent brain damage from elevated intracranial pressure.

About two hours after Johnson's arrival at the hospital, Doctors Meltzer and Marshall—both neurosurgeons—became involved in Johnson's care. They performed an operation to insert an instrument into Johnson's skull to monitor intracranial pressure. They apparently completed this procedure somewhere between 7:10 a.m and 7:20 a.m. Then, at 8:30 a.m., Dr. Meltzer signed a consent form to authorize giving Johnson a drug called U–74,006F. At the time Dr. Meltzer signed the form, Johnson was unconscious, and therefore unable to give or withhold his consent. As of June 1991, when these events occurred, the FDA had not approved U–74,006F for general use, but had approved it for clinical trials. (The record does not reveal whether the drug was ever approved by the FDA.) Johnson's claims against the doctors relate exclusively to the administration of U–74,006F without his consent.

Charles Wayne Johnson, Pro per, Tehachapi, California, defendant-appellant.

James E. Friedhofer, Lewis, D'Amato, Brisbois & Bisgaard, San Diego, California, for defendants-appellees Meltzer and Marshall; Nathan C. Northrup, Deputy, County Counsel, County of San Diego, for defendant-appellee Visconti; Karen M. Walter, Deputy Attorney General, State of California, San Diego, California, for defendants-appellees Lierly and Herrera.

** Honorable Donald P. Lay, United States Circuit Judge for the 8th Circuit, sitting by designation.

At approximately 6:30 a.m. on the morning of the accident, June 14, California Highway Patrol Officer Herrera visited Johnson at UCSD to obtain photographs and fingerprints. It took about 4 to 5 minutes for Herrera to obtain the photographs and fingerprints. Johnson was unconscious during that time.

Johnson alleges that on the same morning, June 14, shortly after Herrera obtained the photographs and fingerprints, Jeffrey Lierly, an officer with the California Highway Patrol, and R. Visconti, a Deputy Sheriff for the County of San Diego, informed the doctors of their intention to conduct a recorded police interview with Johnson, and "instructed that he be awakened from the medically induced coma." Johnson further alleges that: the doctors woke him from his coma in response to the officers' instructions; the officers proceeded to interview him; and that the process "contribute[d] greatly to the plaintiff's brain injuries."

Lierly and Visconti deny that they ever requested physicians to awaken Johnson from a coma. They also deny that any interview took place on June 14.

Visconti alleges that he visited Johnson at UCSD a week later, on June 21, 1991, to obtain "standard booking information." He further alleges that Johnson was "awake and alert" when he arrived, and that Johnson "willingly provided standard booking information in response to my questions."

On June 25, 1991, Lierly went to UCSD for the purpose of interviewing Johnson regarding the criminal charges. Lierly alleges that Johnson was conscious when he arrived, and that he (Lierly) "did not request U.C.S.D. Medical Center medical personnel alter the medical condition of plaintiff, awake him from a medically-induced coma, or do anything to ... deny, delay or intentionally interfere with plaintiff's medical treatment."

More than two years after the events at issue, Johnson filed a pro se complaint under 42 U.S.C. § 1983. After extended legal maneuvering by all parties, Johnson filed a second amended complaint. Upon a motion by the defendants, the district court entered summary judgment in favor of defendants Meltzer, Marshall, Herrera, Lierly, Visconti and Elgin. Johnson filed a timely appeal.

### Discussion

#### I

■ Initially two procedural matters must be addressed. First, the district court granted summary judgment in favor of a defendant (D.Elgin) who was never served. The Federal Rules of Civil Procedure provide that when a defendant remains unserved after 120 days, the district court "shall dismiss the action without prejudice." Fed. R. Civ. Proc. Rule 4(m). Accordingly, Elgin was not entitled to summary judgment. On remand, the court should dismiss Johnson's claims against Elgin without prejudice.

■ Second, the district court failed to name defendant Visconti in its judgment, even though the body of the court's order makes it clear that the court meant to grant him summary judgment. *See* District Court's Order at 6, 8. This court has established that a district court's discussion in the body of the order indicating its intent to make a final judgment suffices to create a final judgment. *Lockwood v. Wolf Corp.,* 629 F.2d 603, 608 (9th Cir.1980) (District court made a final judgment on counterclaim despite omission from judgment because the order stated that the counterclaim was barred.). *See also Bankers Trust Co. v. Mallis,* 435 U.S. 381, 387–88, 98 S.Ct. 1117, 1121–22, 55 L.Ed.2d 357 (1978) (District court's intention that order be final judgment suffices to make it so).

The district court clearly intended to include Visconti in its grant of summary judgment. Indeed, no one, including Visconti's attorney, has evidenced notice that his name is not included in the judgment. Accordingly, we treat the district court's decision as granting Visconti's motion for summary judgment and creating a final appealable order.

#### II

■ We now turn to the question whether the doctors were entitled to summary judgment. The district court con-

strued Johnson's claim against the doctors as a claim for deliberate indifference to his medical needs arising under *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). *See* District Court Order at 6–7. The district court interpreted Johnson's pleading to allege that the doctors used U–74,006F "to treat his serious head injury without his consent." District Court Order at 6. This statement limits Johnson's claim by characterizing the doctors' actions as "treatment" while Johnson has consistently maintained that the doctors acted for research purposes unrelated to treating him. Johnson's second amended complaint clearly states that his "due process rights have in fact been violated." He asserts that the doctors used him "as some sort of a human rat to test an experimental drug." Recognizing Johnson's pro se status, we construe his complaint liberally to state a claim for violation of his constitutionally protected liberty interest in bodily integrity. On these pleadings, the proper analysis requires a factfinder to establish the predominant motive.

■ Whatever grammarians may think of the anomalous expression, "substantive due process," it is well established that a person's liberty interest in bodily integrity is one of the personal rights accorded substantive protection under the Due Process Clause. *See, e.g., Albright v. Oliver,* 510 U.S. 266, 272, 114 S.Ct. 807, 812, 127 L.Ed.2d 114 (1994) ("The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, *and the right to bodily integrity.*") (emphasis added).

In the past decade, the Supreme Court has decided two "substantive due process" cases involving the nonconsensual administration of medication. In *Washington v. Harper,* the Court held that "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical inter-

est." 494 U.S. 210, 227, 110 S.Ct. 1028, 1039–40, 108 L.Ed.2d 178 (1990). In *Riggins v. Nevada,* the court held that forced administration of antipsychotic medication to a criminal defendant during trial violated his Fourteenth Amendment due process rights, because the state failed to make the required showing of both an "overriding justification and a determination of medical appropriateness." 504 U.S. 127, 135, 112 S.Ct. 1810, 1815, 118 L.Ed.2d 479 (1992).

■ These cases demonstrate that due process requires that if a doctor gives a drug to an inmate without his consent, the drug must be medically appropriate. While Johnson was not an inmate, we can, for purposes of this appeal, apply the rules governing inmates to him, for he prevails even under the standard applicable to persons of that status. In this case, if the U–74,006F was administered for Johnson's medical benefit in an emergency situation where the doctors could not obtain his consent, it might be medically appropriate. It does not automatically follow, however, that the giving of the experimental drug without consent was for Johnson's medical benefit. That is a fact that remains in issue in this case.

The doctors claim that medical necessity existed. They argue that when they administered the drug Johnson was unconscious and therefore "the physicians had to make Johnson's medical choices for him." January 5, 1998 Letter Brief at 1. Accordingly, they reason, they did not violate Johnson's right to bodily integrity. This argument would have merit only if the doctors gave Johnson U–74,006F for his benefit, and not for research purposes.

Johnson did introduce evidence in the district court that the doctors gave him U–74,006F for research purposes and not for his medical benefit. The consent form that Dr. Meltzer signed was captioned: *Consent for Participation in a Research Project.*[1] In discussing U–74,006F, the form states:

---

1. It is instructive to compare the consent form that Dr. Meltzer signed, which authorized administration of U–74,006F, with a different consent form signed by another doctor, which is entitled: *Consent to Operation/Therapeutic Procedure, An-*

*esthesia, Other Services.* The consent form signed by Dr. Meltzer refers throughout to "research." The other consent form, in contrast, refers to "treatment."

There is likely to be no direct benefit to me from these procedures. The investigators may learn more about the safety of U–74,006F in patients with head injury.

The form also notes that the patient "will be randomized to receive either U–74,006F or a placebo during the first 5 days of [his] hospitalization." These statements suggest that U–74,006F was given to Johnson for research purposes, not for his benefit.

Johnson also alleges that the FDA made its approval of U–74,006F contingent on the requirement that the drug could be administered to patients only with their written consent. *See* Johnson's Brief, "Claims Raised in the District Court," first attachment page. Johnson offers no specific evidence to support this allegation, but the doctors have not denied the allegation. Clearly the resolution of this question bears on whether the doctors violated Johnson's rights by giving him U–74,006F.

Of course, the doctors have introduced evidence that supports their claim that they gave Johnson the drug for his benefit. Dr. Brian Copeland, a board certified neurosurgeon, stated that U–74,006F "is typically used to treat patients with severe head injuries to control intracranial pressure." Meltzer Excerpts of Record at 2. He also stated that "[t]he patients who become candidates for the drug have an increased likelihood of a good outcome (60%) than without the drug (40–45%)." *Id.*

In short, there is some evidence to support the doctors' claim that administration of U–74,006F was for Johnson's benefit, but there is other evidence that contradicts that claim. Since the conflicting evidence presents a genuine issue of material fact, the district court erred by granting summary judgment in favor of the doctors. Thus, upon remand, a factfinder will have to determine: (1) whether the doctors' predominant intent was to provide Johnson medical treatment or to further their own medical research; and (2) whether, assuming the doctors' predominant intent was to provide Johnson medical treatment, they reasonably believed that the treatment would be beneficial.

## III

Johnson alleges that Herrera, Lierly and Visconti violated his constitutional rights under the Eighth Amendment, as incorporated in the Fourteenth Amendment, by acting with deliberate indifference to his serious medical needs.

Officials violate the Eighth Amendment when they are deliberately indifferent to the serious medical needs of convicted prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). To state such a claim, a prisoner must show that the official knew of and disregarded a substantial risk of serious harm to his health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 1978–79, 128 L.Ed.2d 811 (1994). Eighth Amendment standards "provide a minimum standard of care for determining a prisoner's rights as a pretrial detainee, including the prisoner's rights ... to medical care." *Carnell v. Grimm*, 74 F.3d 977, 979 (9th Cir.1996) (quoting *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir.1986)). Accordingly, the issue is whether Officers Herrera, Lierly and Visconti knew of and disregarded a substantial risk of serious harm to Johnson's health or safety.

### A. *Involvement of Officer Herrera*

Johnson alleges that Herrera interfered with his medical treatment when Herrera took his photograph and fingerprints while he was unconscious. In response, Herrera has stated the following in an affidavit:

No medical staff member was treating the black male adult patient while I was in his presence on June 14, 1991.... I did not request U.C.S.D. Medical Center medical personnel alter the medical condition of the black male adult, awake him from a medically-induced coma, or do anything to facilitate my photographing or obtaining fingerprints from him. I have no information anyone delayed treatment of the black male adult in order for me to obtain fingerprints or to photograph him.... Photographing and fingerprinting the black male adult patient took approximately 4 to 5 minutes.... I was not deliberately indifferent to plaintiff's medical needs when I

obtained his fingerprints and photographed him. I did not deny, delay or intentionally interfere with the plaintiff's medical treatment.

Lierly and Herrera's Supplemental Excerpts of Record at 97–98.

Johnson has failed to present any evidence to contradict Officer Herrera's account of what happened when Herrera took Johnson's photograph and fingerprints. Therefore, the district court properly granted summary judgment in favor of Herrera.

### B. *Involvement of Officers Lierly and Visconti*

 The claim against Lierly and Visconti is based on the allegation that they woke Johnson from a medically induced coma.[2] Johnson alleges that the following events occurred on June 14, 1991, shortly after he was admitted to UCSD:

[The officers] did inform Dr. Davis of there [sic] intentions to conduct a recorded police interview with the plaintiff and instructed that he be awaken from the medically induced coma.

Dr. Davis then did disregard concern for the plaintiff's life and fully complied with the instructions of [Lierly and Visconti]. Dr. Davis then allowed the plaintiff to regain full consciousness, then intubated him so he could speak to the above mentioned defendants.

Defendants Lierly . . . and Visconti then did, with full and complete knowledge of the excessive risk of irreparable harm to the plaintiff, inhibit the plaintiff's requisite medical care to unlawfully photograph and conduct a tape recorded police interview with the plaintiff. This police interview did clearly torture the plaintiff's already critically traumatized brain, and did contribute greatly to the plaintiff's brain injuries.

Lierly and Herrera's Supplemental Excerpts of Record at 51.

Lierly and Visconti deny in sworn declarations that: (1) that they were even present at UCSD on June 14, 1991; (2) that they interviewed Johnson on that date; and (3) that they, on any date, woke Johnson from a coma for the purpose of interviewing him. To survive summary judgment, Johnson must produce some evidence to support his allegations: (1) that Lierly and Visconti woke him from a coma; and (2) that in doing so they *knowingly* exposed him to a substantial risk of harm. *See Farmer v. Brennan*, 511 U.S. at 837, 114 S.Ct. at 1979 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference").

Johnson has produced evidence sufficient to survive summary judgment. Johnson produced a document entitled "Evidence/Property Report/Receipt," which refers to the "Charles Johnson Interview," and bears the date 6–14–91. The document names J. Lierly as the reporting officer. Lierly and Herrera's Supplemental Excerpts of Record at 209. Johnson claims that this document proves that an interview did take place on June 14, 1991. Although appellees deny that any interview took place on that date, they do not attempt to explain the significance of the evidence receipt.

 Johnson has also relied upon statements that Visconti allegedly made to him. Johnson states in his motion opposing summary judgment that:

While at his place of employment during the years 1991 and 1993, Deputy Visconti did personally brag to the plaintiff and inform the plaintiff whom did what to him, when it was done, why it was done and then laughed when the plaintiff became angry, stating, in relevant part: "so sue us."

Visconti's Supplemental Excerpts of Record at 26–27. Johnson swore that this statement is "true and correct." It was based on personal knowledge and suffices to make Johnson's motion a verified motion. *See Schroe-*

---

**2.** In certain documents, Johnson has alleged that Officer Herrera was also partly responsible for waking him from his coma. However, Johnson's appellate brief does not name Herrera as one of the officers responsible for waking him from his coma. Hence, we assume that this claim relates exclusively to Lierly and Visconti.

*der v. McDonald,* 55 F.3d 454, 460 (9th Cir. 1995). Like a verified complaint, a verified motion functions as an affidavit. *Autera v. Robinson,* 419 F.2d 1197, 1202 n. 22 (D.C.Cir. 1969). Accordingly, the facts that Johnson set forth in his motion are evidence to be considered when deciding a motion for summary judgment. Viewing the evidence in the light most favorable to the non-moving party, we conclude that there is a genuine issue as to whether Johnson was interviewed by one or more officers on June 14, 1991.

The judgment in favor of Officer Herrera is AFFIRMED. The judgment in favor of Officers Elgin, Visconti and Lierly and Doctors Meltzer and Marshall is REVERSED AND REMANDED to the district court for further proceedings.