PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

JAMES BROWN, Administrator of the
Estate of Robert Brown,
Plaintiff-Appellant,

v.

G. W. HARRIS; NANCY SVEC; J. O.
OGDEN,                                             No. 00-1127
Defendants-Appellees,

and

N. E. BISHOP; A. E. SMITH; R. G.
FIELDS,
Defendants.

Appeal from the United States Magistrate Court
for the Eastern District of Virginia, at Norfolk.
William T. Prince, Magistrate Judge.
(CA-99-187-2)

Argued: November 1, 2000

Decided: February 16, 2001

Before LUTTIG and TRAXLER, Circuit Judges, and
Alexander WILLIAMS, Jr., United States District Judge
for the District of Maryland, sitting by designation.

_____

Affirmed by published opinion. Judge Luttig wrote the opinion, in
which Judge Traxler and Judge Williams joined.

_____

**COUNSEL**

**ARGUED:** Robert John Haddad, SHUTTLEWORTH, RULOFF, GIORDANO & SWAIN, P.C., Virginia Beach, Virginia, for Appellant. Matthew P. Dullaghan, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee Svec; Samuel Lawrence Dumville, Virginia Beach, Virginia, for Appellees Harris and Ogden. **ON BRIEF:** Mark L. Earley, Attorney General of Virginia, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee Svec.

_____

**OPINION**

LUTTIG, Circuit Judge:

Decedent Robert Brown took his own life while detained by county officials on a probation violation. Appellant James Brown, the decedent's father and the administrator of his estate, brought state tort claims and federal constitutional claims pursuant to 42 U.S.C. § 1983 against several officials who allegedly had custody of decedent either prior to or at the time of Brown's suicide. The magistrate judge granted judgment as a matter of law to the officials. For the reasons that follow, we affirm.

I.

Decedent Robert Brown was taken into custody pursuant to an arrest warrant issued by Nancy Svec, an employee of the Virginia Beach Probation and Parole Department and Brown's probation officer. J.A. 117. The warrant was issued because Brown had failed a random urinalysis drug test, J.A. 123, and had admitted during a telephone conversation with Svec that he was taking 8-10 pills a day and had attempted suicide the week prior by overdosing on unspecified pills. J.A. 126. This information led Svec to conclude that Brown posed a danger to his parents and others. J.A. 128.

Svec accompanied Virginia Beach Police Officer Switzer to Brown's parents' home to effectuate the arrest. J.A. 52-53. Pursuant

to a search, Svec and Switzer found pills on Brown's person, in his bedroom, and in his car. J.A. 129-30. They then transported Brown to the Virginia Beach General Jail for processing on a probation violation. J.A. 130.

When they arrived at the jail, Svec had a short conversation with James Ogden, the supervisor of Central Processing for the jail. J.A. 46, 143. Svec testified at trial that she informed Ogden that Brown "was suicidal, psychotic, [and subject to] volatile withdrawal" and had attempted suicide the week before. J.A. 120, 144, 146, 158. Svec also conveyed to Ogden that her primary concern was that Brown could become "volatile" and possibly "attack people" as he withdrew from drugs. J.A. 118, 135-36, 141-46, 158-59, 166. Specifically, Svec testified during her deposition -- portions of which were read verbatim at trial (including this passage) -- that she believed she had also told Ogden that Brown had "previously attacked a staff member while in detox." J.A. 144. Ogden testified, by contrast, that Svec never informed him that Brown was suicidal, only that he "has violent episodes while coming off of prescription drugs." J.A. 166. Ogden subsequently placed Brown on "medical watch," which consisted of continuous video surveillance of his cell. J.A. 164-65, 167-68.[1]

Three days following his arrival at Virginia Beach General Jail, Brown hung himself in his cell by his shoe laces. J.A. 45-46. Although Brown's cell was under video surveillance, Gwen Harris -- the officer responsible that day for monitoring Brown's cell as well as 27 others by way of small video screens -- did not notice that Brown had hung himself until after the "code" was called by someone else. J.A. 45, 169-72. The undisputed medical testimony at trial established that Brown had been deprived of oxygen for at least four minutes. J.A. 103. As a result, Brown was hospitalized and placed on a ventilator. J.A. 133. He died seven days later. J.A. 46.

Appellant James Brown, decedent's father and the administrator of his estate, filed a lawsuit against Svec, Ogden, and Harris (collec-

_____

[1] Ogden testified that had he known Brown was suicidal, he would have had him "examined by medical," and placed in a paper gown. J.A. 161.

tively the "appellees") in the Eastern District of Virginia.[2] The first count of the amended complaint asserted a section 1983 action against each of the appellees, alleging that they were deliberately indifferent to Brown's serious medical needs in contravention of the Eighth Amendment. J.A. 35-36. In count II, appellant alleged that the appellees were grossly negligent under state law "in failing to supervise the decedent's condition . . . and in generally completely abdicating their responsibilities to the decedent." J.A. 36.

The parties consented to have the case tried before a magistrate judge. See 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. Following a full trial on the merits, the appellees filed a motion for judgment as a matter of law. The magistrate judge granted the motion, and entered judgment for the appellees on all claims. J.A. 273. The magistrate judge subsequently denied appellant's motion for reconsideration and for a new trial. J.A. 366.

II.

The first issue on appeal is whether Brown's suicide barred the representative of his estate from recovering on any derivative state claims. Appellant brought wrongful death actions against Svec and Ogden, and a separate gross negligence claim against Harris. Reviewing the grant of judgment as a matter of law de novo, see Brice v. Nkaru, 220 F.3d 233, 237 (4th Cir. 2000), we agree with the magistrate judge that, as a matter of law, appellant's evidence failed to establish that Brown was of unsound mind when he took his own life.

In granting judgment as a matter of law on those claims, the magistrate judge held that Brown's actions constituted common law suicide, and that any cause of action resulting from the suicide, an immoral and illegal act under Virginia law, was barred. J.A. 270-71. Under Virginia law, "[i]t is well settled that, as a general rule, `a party who consents to and participates in an immoral or illegal act cannot recover damages from other participants for the consequence of that act.'" Wackwitz v. Roy, 418 S.E.2d 861, 864 (Va. 1992). As a result, the Virginia Supreme Court held in Wackwitz that, because suicide is

_____

[2] The claims against two other jail officials were dismissed prior to trial.

4

a common law crime, it "precludes recovery for injuries sustained as a result of that act." Id. at 864.

Appellant's state claims seek damages for injuries resulting from Brown's taking of his own life and consequentially are barred under Wackwitz if Brown committed common law suicide. To commit suicide at common law, a person must: (1) take his own life; (2) be "of years of discretion"; and (3) be of "sound mind." See id. at 864-65. A person is of "sound mind" if competent and sane. See Hill v. Nicodemus, 979 F.2d 987, 990 (4th Cir. 1992) (applying Virginia law). It is undisputed that Brown was not a minor when he took his own life; therefore, unless Brown was incompetent or insane at the time, appellant's state claims are barred.

Appellant does not dispute that suicide constitutes a per se bar to recovery, but rather argues that there was sufficient evidence in the record for the jury to conclude that Brown was of unsound mind. Appellant relied exclusively on the testimony of Dr. Benjamin Carey to establish that fact at trial. While Carey testified that Brown suffered from bipolar disorder, we agree with the magistrate judge that his testimony was insufficient to create a jury question regarding Brown's competency or sanity for two reasons.

First, Carey assessed Brown's mental condition at a discrete point in time, more than three months prior to Brown's death. J.A. 302, 306. Carey expressed no view about whether Brown was insane or incompetent at the time he took his own life. Indeed, appellant failed to proffer any contemporaneous assessment of Brown's mental condition. At best, therefore, Carey's testimony, and by extension appellant's evidence, establishes only that Brown may have been insane or incompetent at a given point in time more than three months prior to his death. Wackwitz and Hill suggest, however, that a decedent's mental soundness must be measured at the time of the self-destructive act. See Hill, 979 F.2d at 990 (noting that insanity is measured "at a given time"); Wackwitz, 418 S.E.2d at 865 (holding that a wrongful death claim arising out of a suicide survived a motion to dismiss because "the plaintiff alleged that her decedent was of unsound mind when he killed himself"). As a result, Carey's testimony, standing alone, is simply insufficient to overcome the legal presumption that Brown

5

was sane when he took his own life. See Hill, 979 F.2d at 990 (stating that there is a presumption that a person is sane under Virginia law).

Second, Carey's testimony does not even prove that Brown was incompetent or insane at the time Carey evaluated him. Under Virginia law, "[t]he term `insane' refers to one who is, at a given time, an `idiot, lunatic, non compos mentis or deranged.'" Hill, 979 F.2d at 990 (citing Nelms v. Nelms, 374 S.E.2d 4, 8 (Va. 1988)). Even reading Carey's testimony in a light most favorable to appellant, Brown's bipolar disorder simply did not render him legally insane. Specifically, Carey testified that:

> [T]here was no evidence that [Brown] was psychotic or had a thought disorder. That he did not appear to have suicidal thinking, any suicidal intent or suicide plan. I thought his memory was grossly intact. He had limited insight, and his judgment was considered fair. So that was the mental status examination.

J.A. 290 (emphases added). In addition, Carey opined that people with bipolar disorder can work in the job force and carry on ordinary life activities. J.A. 301.

Of particular significance is Carey's opinion that Brown did not suffer from a thought disorder and that his judgment was fair. Carey clearly believed that people suffering from bipolar disorder can be sane and competent and, in particular, that Brown could function in society. As a result, appellant has not only failed to show that Brown was insane or incompetent at the time he took his own life, but appellant has also neglected to present evidence that Brown was ever insane or incompetent as those terms are defined under Virginia law.**3**

_____

**3** Neither Hill or Wackwitz provides a definition for the term "competent." In Hill, for example, we concluded that decedent was of sound mind under Virginia law when she took her own life without specifically addressing whether decedent was competent. See Hill, 979 F.2d at 987. To the extent that competency is not equivalent to sanity, Carey clearly foreclosed the possibility that Brown was incompetent under any reasonable definition of that term; he specifically testified that Brown was able to intelligently discuss his financial and legal difficulties and reasonably

6

In granting judgment as a matter of law on appellant's state claims, the magistrate judge correctly noted that it would be inappropriate to "permit [the jury] to speculate that just because [Brown] had bipolar disorder that he was close to insan[e], that he had an unsound mind." J.A. 276. Because appellant has failed to adduce any evidence that Brown was an idiot, lunatic, non compos mentis, deranged, or otherwise incompetent at the time he took his own life, we hold that the magistrate judge did not err in granting judgment as a matter of law to the appellees on appellant's state claims.[4]

III.

Appellant also argues on appeal that the magistrate judge erroneously granted judgment as a matter of law to the appellees on his section 1983 claims.[5] Appellant alleged in his amended complaint that the appellees were deliberately indifferent to Brown's serious medical

_____

articulate and understands "things." J.A. 305; cf. Bramblett v. Commonwealth, 513 S.E.2d 400, 407 (Va. 1999) (recognizing that under Virginia statute, a person is not competent to stand trial if "`there is probable cause to believe that the defendant lacks substantial capacity to understand the proceedings against him or to assist his attorney in his own defense'"); Drewry v. Drewry, 383 S.E.2d 12, 15 (Va. Ct. App. 1989) (stating that the presumption that a person is mentally competent to enter into a contract can be overcome by "proof that when the person executed the agreement he or she lacked the capacity to understand the nature and consequences of the transaction").

[4] While no published decision has applied Virginia's suicide bar to any claim other than one for wrongful death, the Virginia Supreme Court specifically stated in Wackwitz that such a bar applies in "both tort and contract actions," in no way limiting its application to wrongful death claims. 418 S.E.2d at 864. As a result, appellant's gross negligence claim against Harris is also barred because it sought damages for injuries resulting from Brown's illegal act of suicide, even though it was purportedly not brought pursuant to the Virginia wrongful death statute. See Va. Code Ann. § 8.01-50.

[5] Although the amended complaint arguably included a section 1983 claim against Harris, J.A. 35-36, appellant abandoned that claim at trial. J.A. 267. As a result, we address only the federal claims brought against Ogden and Svec.

7

needs in violation of the Eighth Amendment. J.A. 35-36. Appellant contends that we should reverse the grant of judgment as a matter of law because there was ample evidence in the record to support every requisite element of his section 1983 claims. We disagree.

Preliminarily, for the purpose of determining the constitutional predicate for appellant's claims, we admit to some uncertainty about whether Brown was a pretrial detainee or a convicted prisoner. The question is whether Brown, who was being held on a probation viola-tion, could be "punished" under the Eighth Amendment. The Supreme Court has stated that "the State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." Ingraham v. Wright, 430 U.S. 651, 671 n.40 (1977). Although the state had already "secured a formal adjudication of guilt" for the crime underlying Brown's probation, it had not yet secured "a formal adjudication" that Brown had violated his probation and should be returned to state custody. And, if Brown was a pretrial detainee rather than a convicted prisoner, then the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, "mandates the provision of medical care to detainees who require it." Hill, 979 F.2d at 991 (emphasis added). In any case, we need not resolve whether Brown was a pretrial detainee or a convicted prisoner because the standard in either case is the same-- that is, whether a government official has been "deliberately indifferent to any [of his] serious medical needs." Belcher, 898 F.2d at 34.

In Farmer v. Brennan, 511 U.S. 825 (1994), the Supreme Court set forth the relevant framework for evaluating constitutional claims premised upon a prison official's "deliberate indifference" to "a sub-stantial risk of serious harm to an inmate." See id. at 828.**6** First, a

_____

**6** We recognize that Farmer was decided after Belcher and addressed only the duties of "prison officials" under the Eighth Amendment. Far-mer, however, merely defined the term "deliberate indifference," a stan-dard previously employed by the Supreme Court in Estelle v. Gamble, 429 U.S. 97 (1976), and its progeny. See Farmer, 511 U.S. at 829. Far-mer in no way undermined our holding in Belcher that the same "deliber-ate indifference" standard applies to both inmates and pretrial detainees. Indeed, other circuits have imported the Farmer framework into cases

8

constitutional violation occurs only where the deprivation alleged is "objectively, sufficiently serious." Id. at 834. For a claim based on a failure to prevent harm, a person must show that he is being detained or incarcerated "under conditions posing a substantial risk of serious harm." Id. A substantial risk of suicide is certainly the type of "serious harm" that is contemplated by the first prong of Farmer. Cf. Gordon v. Kidd, 971 F.2d 1087, 1094 (4th Cir. 1992) (applying the deliberate indifference standard to the conduct of government officials when a prisoner suffers from a "serious psychological condition[ ]" such as being suicidal); Buffington, 913 F.2d at 120 (same).

Second, an official must have "a `sufficiently culpable state of mind.'" Farmer, 511 U.S. at 834. In prison-conditions cases, the requisite state of mind is "deliberate indifference." See id. In rejecting an objective standard of liability in favor of the subjective standard of "deliberate indifference," the Supreme Court stated that,

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

_____

involving pretrial detainees. See Zentmeyer v. Kendall County, Illinois, 220 F.3d 805, 810-11 (7th Cir. 2000); Johnson v. Meltzer, 134 F.3d 1393, 1398 (9th Cir. 1998); Wyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996); Hare v. City of Corinth, MS, 74 F.3d 633, 643 (5th Cir. 1996). And, the fact that Farmer refers only to"prison officials" is of no moment because we have held that the "deliberate indifference" standard applies in cases involving police officers and other government officials. See Buffington, 913 F.2d at 120 (applying the"deliberate indifference" standard to the actions of police officers); Belcher, 898 F.2d at 34 (explaining that government officials cannot be deliberately indifferent to the serious medical needs of a detainee). Indeed, other circuits have held the same following Farmer. See,e.g., Davis v. Brady, 143 F.3d 1021, 1024-26 (6th Cir. 1998); Lancaster v. Monroe County, Alabama, 116 F.3d 1419, 1425 n.6 (11th Cir. 1997).

9

Id. at 837. Farmer expressly equated the "deliberate indifference" standard applied in Eighth Amendment cases with the "subjective recklessness" standard of criminal law. See id. at 839-40; Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997). We noted in Rich that "[t]rue subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." 129 F.3d at 340 n.2.

Significantly, an official "who actually [knows] of a substantial risk to inmate health or safety may be found free from liability if [he] responded reasonably to the risk, even if the harm was not ultimately averted." Farmer, 511 U.S. at 844. The Court went on to note that, "[w]hether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." Id.

While the Court left open the question of whether the "reasonable response" prong of Farmer is part of the state of mind requirement or whether it instead stems from the duty to "ensure reasonable safety," id., this prong nonetheless protects officials who act reasonably in response to a known risk. To the extent that the "reasonable response" prong is part of the state of mind requirement, an official who responds reasonably to a known risk has not "disregard[ed] an excessive risk to inmate health or safety," Farmer, 511 U.S. at 837, and has therefore not acted with deliberate indifference. See, e.g., Hamilton v. Leavy, 117 F.3d 742, 748 (3d Cir. 1997) ("If a prison official responds reasonably to a risk to an inmate's safety, he or she cannot be found to have acted with a sufficiently culpable state of mind."); Doe v. Welborn, 110 F.3d 520, 524 (7th Cir. 1997) (stating that the "reasonable response" prong of Farmer is simply "another way of saying that a plaintiff has the burden of proving the subjective (knowing disregard) component of the test elaborated in Farmer.").

We hold that the district court did not err in granting judgment as a matter of law to Ogden and Svec because even if they had knowledge that Brown posed a potential suicide risk, they did not disregard an excessive risk to Brown's health or safety because they responded reasonably to the risk that they knew. We will specifically address the liability of each in turn.

10

A.

In reviewing a grant of judgment as a matter of law, we must view the facts in a light most favorable to the non-moving party, in this case the appellant. See Connor v. Schrader-Bridgeport Int'l, Inc., 227 F.3d 179, 184 (4th Cir. 2000). Thus, in reviewing whether the magistrate judge correctly granted judgment as a matter of law to Ogden, we must credit Svec's testimony that she informed Ogden that Brown was suicidal and had attempted suicide the week before.

Even if Ogden was told that Brown presented a suicide risk and drew the inference under Farmer that "a substantial risk of serious harm exist[ed]," 511 U.S. at 837, he avoids liability if he responded reasonably to the risk of which he knew. 511 U.S. at 844. In determining the substantiality of the risk that Ogden knew, and the reasonableness of his response to it, we must consider everything that he was told and observed. Although we assume that Ogden knew that Brown presented a suicide risk of some kind, the record also indicates that he knew that Svec's greatest concern was Brown's withdrawal from his drugs, and in particular, his resulting volatility. J.A. 118, 141-44, 158-59, 166.

It is undisputed that Ogden responded by immediately placing Brown on "medical watch," which established constant video surveillance of Brown's cell. Although Ogden failed to place him in a paper gown or have him examined by "medical" -- which is what he ordinarily would have done with a suicidal detainee-- his failure to take these additional precautions does not create a jury issue under Farmer if his actions were nonetheless reasonable in response to the risk of which he actually knew. See Liebe v. Norton, 157 F.3d 574, 577 (8th Cir. 1998) (noting that under Farmer, a court must focus on the precautionary actions actually undertaken by an official in response to a risk of suicide, not those actions which could have been taken). It was reasonable for Ogden to respond by placing Brown on "medical watch" because from what he knew, the risk of medical or other psychological problems was just as likely, or even more predominant than, the risk of suicide. And, of course, placing Brown on continuous video surveillance also reduced the risk of suicide itself. As a result, we cannot say that placing Brown on "medical watch" was anything other than a deliberate and reasonable response to the risk that he

11

knew. See Rellergert v. Cape Girardeau County, Missouri, 924 F.2d 794, 797 (8th Cir. 1991) (stating that a policy which places inmates with suicidal tendencies on nearly constant watch is an affirmative and deliberate step to prevent suicides); see also Lewis v. Richards, 107 F.3d 549, 553 (7th Cir. 1997) (stating that summary judgment might have been inappropriate under the "deliberate indifference" standard if the defendants had simply refused to do anything).

In the end, if we assume that Ogden was told that Brown was suicidal, he simply took less action than he could have, and by his own admission, should have. J.A. 160-61. That does not, however, either negate the reasonableness of his response or mean that he acted with "deliberate indifference." At most, Ogden's failure to take additional precautions was negligent, and not deliberately indifferent, because by placing Brown on constant video surveillance, he simply did not "disregard[] an excessive risk to [Brown's] health or safety." Farmer, 511 U.S. at 837 (emphasis added). Negligence, however, does not give rise to a constitutional claim when the operative standard is "deliberate indifference." See Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard -- a showing of mere negligence will not meet it."). As a result, we hold that there was no basis for a reasonable factfinder to conclude that Ogden acted with deliberate indifference to the risk which he knew.

B.

We now turn to the issue of whether Svec was entitled to judgment as a matter of law on appellant's section 1983 claim. The magistrate judge granted judgment as a matter of law to Svec on the basis that Brown was never in her custody and that, therefore, Svec owed him no duty. See Pinder v. Johnson, PFC, 54 F.3d 1169, 1175 (4th Cir. 1995) (en banc) ("Without any such limitation imposed on her liberty, Deshaney indicates [plaintiff] was due no affirmative constitutional duty of protection from the state."). We need not reach that question, however, because we hold that even if Brown was in Svec's custody, she acted reasonably in response to the risk which she knew.

In reviewing the judgment in favor of Svec, we must credit Ogden's testimony and assume that Svec did not inform Ogden about Brown's suicidal tendencies and his previous suicide attempt. J.A. 160. Appellant argues that a reasonable factfinder could conclude,

12

based on that failure, that Svec acted with "deliberate indifference." We disagree.

Like Ogden, Svec took deliberate, precautionary steps to reduce the risk that Brown would commit suicide. First, Officer Switzer and Svec removed drugs from Brown's person, bedroom, and car prior to releasing him to the jail's custody, thereby eliminating his access to the instrumentality that he used to attempt suicide previously. J.A. 129-30, 141-42. Second, even if Svec did not tell Ogden that Brown was suicidal, it is undisputed that she at least told him that Brown "has violent episodes while coming off his prescription drugs," which was indisputably her primary concern at the time. J.A. 135, 166. In response to that warning, Ogden informed Svec that Brown would be placed "on camera," which was, as stated above, a deliberate step in ensuring Brown's safety. J.A. 167.

As with Ogden, Svec's actions must be measured in light of the risk that she knew. Based on her trial testimony and her deposition testimony read at trial, Svec knew the following when she spoke with Ogden: (1) she "didn't have any concerns" about the suicide because "[Brown] had no longer taken the pills and didn't have access to the pills" after she removed them, J.A. 141-42; (2) her "main concern" at the time was Brown's volatility resulting from drug withdrawal, J.A. 135; (3) she issued the arrest warrant because she believed that Brown posed a "danger to his parents and others," J.A. 128; and (4) Brown would be placed "on camera" while in jail, J.A. 167. While Svec could have taken the extra step of informing Ogden about Brown's suicidal tendencies, we cannot say that her failure to do so was deliberately indifferent in light of what she knew both about the risk and the precautionary actions undertaken to protect Brown, including her own. Therefore, we conclude that Svec's actions were reasonable, and that no reasonable factfinder could have found her "deliberately indifferent."

CONCLUSION

For the reasons stated herein, we affirm the judgment of the magistrate judge.

AFFIRMED

13