436 F.3d 422
 Mary SHORT, Individually and as the Administratrix of the Estate of Thomas Lee Short, Sr., Deceased, Plaintiff-Appellee,
v.
William SMOOT, Deputy; Michael Beatty, Deputy; Troy Oakes, Deputy; George Lewis, Deputy; Harry Ferguson, Deputy, Defendants-Appellants, and
Daniel T. McEathron, Sheriff; Kurt Kensy, Deputy; Jeremy Seal, Deputy, Defendants.
 No. 05-1284.
 United States Court of Appeals, Fourth Circuit.
 Argued December 1, 2005.
 Decided February 2, 2006.
 
 ARGUED: Brian Keith Brake, Keeler Obenshain, P.C., Harrisonburg, Virginia, for Appellants. Blair Duncan Howard, Howard, Morrison & Howard, Warrenton, Virginia, for Appellee. ON BRIEF: Patrick C. Asplin, Keeler Obenshain, P.C., Harrisonburg, Virginia, for Appellants. Christopher T. Whelan, Paul A. Morrison, Howard, Morrison & Howard, Warrenton, Virginia, for Appellee.
 Before WILKINS, Chief Judge, GREGORY, Circuit Judge, and WALTER D. KELLEY, Jr., United States District Judge for the Eastern District of Virginia, sitting by designation.
 Affirmed in part, reversed in part, and remanded by published opinion. Chief Judge WILKINS wrote the majority opinion, in which Judge KELLEY joined. Judge GREGORY wrote an opinion concurring in part and dissenting in part.
 OPINION
 WILKINS, Chief Judge.
 
 
 1
 Warren County, Virginia Sheriff's Deputies William Smoot, Michael Beatty, Troy Oakes, George Lewis, and Harry Ferguson (collectively, "Appellants") appeal a district court order denying their motion for summary judgment on qualified immunity grounds in an action brought by Mary Short, individually and as a representative of the estate of her husband, Thomas Lee Short. Mrs. Short's action alleges that Appellants acted with deliberate indifference to a substantial risk that Mr. Short would commit suicide while detained in the Warren County Jail. We affirm in part, reverse in part, and remand for further proceedings.
 
 I.
 
 2
 In reviewing an order denying summary judgment based on qualified immunity, we accept as true the facts that the district court concluded may be reasonably inferred from the record when viewed in the light most favorable to the plaintiff. See Gray-Hopkins v. Prince George's County, 309 F.3d 224, 229 (4th Cir.2002). Thus, for purposes of resolving this appeal, we assume the following facts:
 
 
 3
 [O]n January 8, 2004, ... Thomas Lee Short was arrested and jailed for assault and battery of his wife, in violation of a September 2003 protective order that prohibited Mr. Short from having any contact with her, from committing acts of family abuse, and from drinking alcoholic beverages. After his release on January 11, 2004, Short went to the Blue Ridge Motel in Front Royal, Virginia, and began drinking heavily. Around 9:30 p.m., Short called his wife, Mary Short, and told her that he was planning to kill himself. Mrs. Short, concerned that her husband would carry out his threat, called the Warren County Sheriff's office to request that they check the local bridges. That office advised her to call the Front Royal Town Police, which she did.
 
 
 4
 Soon after calling his wife, Mr. Short also called his daughter, Linda Good, to tell her that he "wanted to die," and to ask if she could come pick him up. When she arrived at the motel, Good found her father so drunk that she decided it would be better to let him sleep and return the next morning. Mr. Short called his wife again at 4:30 a.m. and repeated his threat to kill himself. He also called his daughter, who told him she would pick him up at noon the next day.
 
 
 5
 Before she returned to the hotel, Good spoke with Mrs. Short, and they decided to have Mr. Short arrested again for violating the September 2003 protective order, believing that this course of action would keep him from harming himself. Mrs. Short went to the Magistrate's Office to file a criminal complaint and the Magistrate issued a warrant for Mr. Short's arrest. The Magistrate then contacted the Front Royal Town Police and told the officer that Mr. Short was "basically a drunk," that he was intoxicated, and that he had called his wife threatening to kill himself. The officer, Sergeant Clint Keller, went to the Short residence, arrested Mr. Short, and transported him to the Warren County Jail.
 
 
 6
 Sergeant Keller took Mr. Short before the Magistrate, who issued an order remanding Mr. Short to custody until he could appear in Warren County General District Court the next day. Sergeant Keller then turned Mr. Short over to the deputies on duty at the jail. Defendants Smoot, Beatty, Oakes, and Lewis were in the jail's monitor room, where Sergeant Keller advised them that Mr. Short had been arrested for violation of a protective order, that he was drunk, and that he had been calling his wife threatening to kill himself.
 
 
 7
 The Warren County Jail Policy and Procedures manual, in effect on January 12, 2004, addressed proper treatment of potentially suicidal inmates. The manual required custodial officers to remove all potential tools such as sheets, blankets, and shoelaces, to conduct inmate checks at random intervals, at least twice per hour, and to make reports of any unusual occurrences. The defendant deputies also received training in treatment of potentially suicidal inmates. If the deputies were aware that the inmate was suicidal, they were instructed to remove his clothing, place him in a suicide "smock," call mental health services, and conduct checks at fifteen-minute intervals.
 
 
 8
 When an intoxicated inmate was brought to the jail, deputies would attempt to process him. If the inmate was unable to give a medical history, then the typical practice was to place the intoxicated inmate in the jail's sick cell, separate from the general population, to sober up, and also to remove all items that could be used for "self-destructive purposes."
 
 
 9
 Despite Sergeant Keller's statement that Short had threatened to kill himself, the deputies never removed Short's clothing and shoelaces or called for a mental health evaluation. Sergeant Smoot took him from the booking area to the bathroom and then to the sick cell, where he removed Short's belt. Several hours later, Smoot heard banging coming from the sick room. He asked Short if he was all right, and Short responded that he was fine. He did not apprise the other deputies of the disturbance, nor did he make a report of an unusual occurrence. Deputy Lewis checked on Short twice, at approximately 5:30 and 6:30 p.m.; both times Short was lying in bed with a sheet over him and appeared to be asleep. Deputy Oakes also checked on Short around 5:00 p.m., and observed that he was asleep.
 
 
 10
 Sergeant Smoot and Deputies Lewis, Oakes, and Beatty's shifts ended at 7:00 p.m. and defendants Deputies Ferguson, Kensy, and Seal arrived. No one in the departing shift informed the incoming deputies that Short had threatened to kill himself; the incoming deputies were only aware that an intoxicated detainee had been brought in and placed in the sick room.
 
 
 11
 The Warren County Jail used surveillance cameras to monitor inmate activity. There were a number of twelve-inch television screens that displayed images from these cameras in the jail's monitor room. During the evening shift, Deputy Ferguson, the officer-in-charge, was in the monitor room from approximately 7:00 to 8:30 p.m., and was responsible for observing monitors as well as answering the telephone and admitting any visitors. He acknowledged that he was aware that an inmate was in the sick cell on the evening of January 12, 2004, and that he observed the monitor showing activity in the sick cell. He left the monitor room for a short time at approximately 8:24 p.m. to respond to an inmate waving a towel at the camera. Deputy Seal was not working in the monitor room. He made rounds of the cells at approximately 7:15 p.m., and again between 8:00 and 8:30 p.m. Seal did not check on the sick cell where Short was housed, believing that it was unoccupied. Deputy Kensy was in the jail records room filing from 7:00 to 8:30 p.m. He passed through the monitor room for a few minutes, but was not present at the jail between 8:35 and 9:00.
 
 
 12
 The court has reviewed the videotape taken from the surveillance camera that recorded Short's activity in the sick room on January 12, 2004. Between approximately 7:00 and 7:30 p.m., Short removed the laces from his shoes, tied them together, and climbed from his bed to the bars of his cell. He tied the shoelaces to the bars and tested their strength. He then tied the laces around his neck. Short repeated this process a number of times, alternating between climbing on the bars and sitting on his bed for several minutes at a time. At approximately 7:36 p.m., Short again climbed from his bed to the bars of his cell, placed the noose around his neck, and hung himself. It was not until approximately 9:00 p.m., when Deputy Seal escorted a new detainee to the sick room, that the deputies discovered Short's body.
 
 
 13
 J.A.1931-35 (footnotes omitted).
 
 
 14
 Mrs. Short subsequently brought this action against Appellants, Deputies Kensy and Seal, and Warren County Sheriff Daniel T. McEathron, pursuant to 42 U.S.C.A. § 1983 (West 2003), contending that the officers violated her husband's rights under the Cruel and Unusual Punishments Clause of the Eighth Amendment by exhibiting deliberate indifference to the substantial risk that he would commit suicide. After the district court dismissed Sheriff McEathron from the action, all remaining defendants moved for summary judgment. The district court denied the motion as to Deputies Smoot, Beatty, Oakes, and Lewis (the first-shift officers), concluding that the forecasted evidence permitted the reasonable inference that the conduct of the first-shift officers constituted deliberate indifference because the officers all were aware of the risk that Short would commit suicide yet failed to follow jail procedure or even "take the simple precaution of warning the next shift that Short was at risk." J.A.1939. The court also denied the motion as to Deputy Ferguson, concluding that the forecasted evidence supported the inference that he exhibited deliberate indifference because he actually witnessed Ferguson's suicide in progress, understood what was happening, and yet made no attempt to intervene.[1]
 
 II.
 
 15
 Appellants first argue that the district court erred in denying summary judgment to the first-shift officers. We agree.
 
 
 16
 Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). It protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable only "for transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir.1992). Thus, government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).
 
 
 17
 In analyzing an appeal from the rejection of a qualified immunity defense, our first task is to identify, "at the appropriate level of specificity," Wilson v. Layne, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), the right that the plaintiff asserts was infringed by the challenged conduct. See Taylor v. Waters, 81 F.3d 429, 433 (4th Cir.1996). We then ask whether the facts, viewed in the light most favorable to the plaintiff, demonstrate a violation of that right. See Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If they do, we consider whether, at the time of the claimed violation, the right alleged to be violated was clearly established— meaning that "a reasonable official would understand that what he is doing violates" the right in question. Id. at 202, 121 S.Ct. 2151 (internal quotation marks omitted).
 
 
 18
 The right in question here, defined at the appropriate level of specificity, is the right of a detainee, whose jailers know that he is suicidal, to have his jailers take precautions against his suicide beyond merely placing him in a cell under video surveillance. We hold that Brown v. Harris, 240 F.3d 383 (4th Cir.2001), demonstrates that no such right derives from the Eighth Amendment.
 
 
 19
 The appropriate framework for evaluating constitutional claims arising from a prison official's "deliberate indifference" to "a substantial risk of serious harm to an inmate" is set out in Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Farmer, 511 U.S. at 828, 114 S.Ct. 1970 (internal quotation marks omitted). First, a constitutional violation can occur only when the deprivation alleged is "objectively, sufficiently serious." Id. at 834, 114 S.Ct. 1970 (internal quotation marks omitted). A substantial risk of suicide is sufficient to satisfy this condition. See Brown, 240 F.3d at 389. Second, the prison official must have "a sufficiently culpable state of mind." Farmer, 511 U.S. at 834, 114 S.Ct. 1970 (internal quotation marks omitted). The subjective component of an Eighth Amendment claim challenging the conditions of confinement is satisfied by a showing of deliberate indifference by prison officials. See id. "[D]eliberate indifference entails something more than mere negligence ... [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Id. at 835, 114 S.Ct. 1970. It requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm. See id. at 837, 114 S.Ct. 1970; Shakka v. Smith, 71 F.3d 162, 166 (4th Cir.1995).
 
 
 20
 Importantly, a prison official "who actually [knows] of a substantial risk to inmate health or safety may be found free from liability if [he] responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844, 114 S.Ct. 1970; see Brown, 240 F.3d at 389. Although it is unclear whether the reasonableness of the response is part of the state of mind requirement or rather derives from the duty to "ensure reasonable safety," Farmer holds that "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." Farmer, 511 U.S. at 844-45, 114 S.Ct. 1970 (internal quotation marks omitted); see Brown, 240 F.3d at 389.
 
 
 21
 Brown demonstrates that the first-shift officers' response to Short's risk of suicide was objectively reasonable and therefore sufficient to prevent liability under the Eighth Amendment. As is relevant here, Brown, like the case at bar, was an action alleging deliberate indifference by the defendants to a suicide risk of their detainee. There, Robert Brown was arrested by a probation officer (Svec), who had learned that Brown was taking 8-10 pills a day and had attempted suicide the prior week by overdosing on pills. See Brown, 240 F.3d at 385. Pursuant to subsequent searches, Svec found pills in Brown's bedroom and car, as well as on his person. See id. Svec then delivered Brown to the Virginia Beach General Jail for processing on a probation violation. See id.
 
 
 22
 At trial, the evidence was conflicting regarding what information Svec shared with the jail supervisor (Ogden). Svec testified that she told Ogden that Brown was suicidal, psychotic, and volatile. See id. On the other hand, Ogden testified that Svec informed him only that Brown had violent episodes and did not tell him that Brown was suicidal. See id. Ogden placed Brown on "medical watch," which established continuous video surveillance of Brown's cell. Id. (internal quotation marks omitted). Nevertheless, Brown hanged himself three days after his arrival at the jail and eventually died as a result. See id. at 385-86.
 
 
 23
 We affirmed a district court order granting judgment as a matter of law to both Svec and Ogden. Regarding Ogden, viewing the evidence in the light most favorable to Brown, we assumed that Ogden had been informed of Brown's suicidal tendencies. See id. at 390. We nevertheless held that, as a matter of law, placement of a detainee in a cell under video surveillance constituted an objectively reasonable response by Ogden to the risk that Brown would kill himself. See id. We further concluded that the reasonableness of the response was not affected by the fact that there were additional precautions, such as placing Brown in a paper gown or having him examined by a medical professional, that Ogden also could have taken. See id. (explaining that even if Ogden "took less action than he ... should have ... [t]hat does not ... negate the reasonableness of his response"); accord Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 309 (4th Cir.2004) (opinion of Williams, Circuit Judge) (citing Brown for the proposition that "the question in deliberate indifference cases is not whether the officials could have taken additional precautions").
 
 
 24
 Here, the first-shift officers' response to the risk that Short would kill himself was the same as Ogden's response in Brown: they placed the detainee in a cell under video surveillance. Thus, under Brown, this response was sufficient under the Cruel and Unusual Punishments Clause regardless of whether additional precautions might also have been advisable.
 
 
 25
 Our dissenting colleague concludes that the officers' response was different from Ogden's in that the officers here "never observed Mr. Short on the video monitor." Post, at 12 (emphasis omitted). Initially, it is important to point out that it hardly seems unusual that none of the first-shift officers would have remembered observing Short on one of the many video monitors in their video monitor bank when the videotape of his time in the cell reveals that he was not doing anything out of the ordinary during their shift except for a couple of times when he banged his shoe against the cell bars or the sink. In fact, he spent most of the time in his bed covered with a sheet. In any event, it is unclear why our colleague considers the fact that the first-shift officers did not actually observe Short on the video monitors to be a difference between the two cases because there is no indication in our opinion in Brown that any officer, including Ogden, ever observed Brown on the video monitor until he had already hanged himself. See Brown, 240 F.3d at 385. The critical point is that despite the actual failure of the officers' measures to prevent the detainees' suicides, and despite possible inattentiveness of the officers whose duty it was at the time of the suicides to watch the monitors, in both Brown and the present case the officers placed their detainees in video-monitored cells, knowing that someone would be responsible for watching the monitors. See id. (stating that there was an officer responsible for viewing the video monitors); J.A. 507-09, 557 (Smoot's deposition testimony that during his shift, after a brief power outage, "[t]here was always someone" with the responsibility of watching the video monitors); id. at 805-07 (Ferguson's deposition testimony that he was responsible for watching the video monitors from 7:00 p.m. until after the time Short hanged himself).
 
 
 26
 In its order, the district court provides only a cursory mention of Brown, stating that the first-shift officers "did not take `less action than they could have,' [as was the case in Brown,] rather, they did virtually nothing." J.A.1939. This characterization does not satisfactorily distinguish Brown, however, because Ogden's response there was essentially identical to that of the first-shift officers here. Although the district court observed that the first-shift officers did not even so much as notify any second-shift officers of the risk that Short would commit suicide, a similar criticism could be leveled against Ogden, who apparently also did not share information about Brown's suicide risk with anyone (and indeed denied he ever received such information). In any event, the availability of additional precautions was immaterial to our decision in Brown, as we have explained.[2]
 
 III.
 
 27
 Appellants next argue that the district court erred in denying summary judgment to Deputy Ferguson. We hold that the district court correctly denied summary judgment.
 
 
 28
 The district court concluded that the forecasted evidence supported the reasonable inference that Ferguson observed Short "removing the laces from his shoes and, over a period of twenty to thirty minutes, climbing on the bars of his cell, tying his shoelaces to the bar, placing a noose around his neck, and testing the weight of the rope." Id. at 1940. On this basis, the district court concluded that the record permitted a reasonable inference that Ferguson knew Short was attempting to commit suicide. See id. & n. 10. The court ruled that failure to make any effort to stop the ongoing suicide attempt, under such circumstances, would constitute deliberate indifference. See id. at 1940-41.
 
 
 29
 Appellants do not dispute that it was clearly established on the day of Short's death that the conscious failure by a jailer to make any attempt to stop an ongoing suicide attempt by one of his detainees would constitute deliberate indifference. Rather, they maintain only that the forecasted evidence was not sufficient to support a reasonable inference that Ferguson knew Short was attempting suicide. We must reject this argument, however, as we are not at liberty during an interlocutory appeal of a denial of summary judgment to question the conclusions of the district court regarding what reasonable inferences the forecasted evidence supports. See Gray-Hopkins, 309 F.3d at 229. We therefore affirm the district court order to the extent that it denies summary judgment to Deputy Ferguson.
 
 IV.
 
 30
 In sum, we reverse the denial of summary judgment to Deputies Smoot, Beatty, Oakes, and Lewis but affirm the denial with regard to Deputy Ferguson, and remand to the district court for further proceedings.
 
 
 31
 
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED
 
 
 
 
 Notes:
 
 
 [1]
 The district court granted summary judgment to Deputies Kensy and Seal
 
 
 [2]
 Our affirmance inBrown of the grant of judgment as a matter of law to Svec also supports our ruling in favor of the first-shift officers here. Because we viewed the evidence in Brown in the light least favorable to Svec in reviewing the grant of judgment as a matter of law in her favor, we assumed that she did not inform Ogden of Brown's suicidal tendencies. See Brown, 240 F.3d at 391. We nevertheless ruled as a matter of law that her removal of the pills from Brown's person, bedroom, and car was a reasonable response to Brown's suicide risk, especially since Svec knew Brown would be placed under video surveillance while in jail. See id. We therefore held that "[w]hile Svec could have taken the extra step of informing Ogden about Brown's suicidal tendencies," her response, as a matter of law, did not constitute deliberate indifference. Id.
 
 
 
 32
 GREGORY, Circuit Judge, concurring in part and dissenting in part:
 
 
 33
 I fully agree with the majority's holding that the district court properly denied qualified immunity to Deputy Ferguson. Because I cannot agree with the majority's conclusion that "Ogden's response [in Brown] was essentially identical to that of the first-shift officers here," ante at 429, I would also affirm the district court's denial of qualified immunity to those officers.
 
 
 34
 As the majority accurately notes, Ogden, the jail supervisor in Brown, had knowledge that the inmate presented a suicide risk. 240 F.3d at 390. In addition, Ogden was concerned that Brown might become volatile due to symptoms of drug withdrawal. Id. Because of his concerns, Ogden made the decision to place Brown on "medical watch" as a precautionary measure. Id. Accordingly, the guards "established constant video surveillance" of Brown's cell over the next three days. Id.
 
 
 35
 The majority concludes today that because the first-shift officers placed Short in a sick cell with a video camera, their actions were constitutionally sufficient under Brown. I disagree with this conclusion, because it is based on a dubious assumption—specifically, that an officer establishes constant video surveillance of an inmate by placing him in a cell with a video camera. Webster's Third New International Dictionary defines surveillance as a "close watch kept over one or more persons" or "continuous observation of a person or area." Webster's Third Int'l Dictionary 2302 (1981). Sergeant Smoot, Deputy Beatty, Deputy Lewis, and Deputy Oakes each testified that he never observed Mr. Short on the video monitor. J.A. 1312, 1407, 1747, 1844. Thus, even though the first shift officers placed Mr. Short in a cell with a video camera, they never established or maintained video surveillance. I, therefore, agree with the district court's conclusion that the first shift officers "did not take less action than they could have, rather, they did virtually nothing." J.A.1939 (internal quotation marks omitted). Accordingly, I would also affirm the district court's denial of qualified immunity as to the first shift officers.