**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1484**

ROXANNE ADAMS, Administrator of the Estate of Jamycheal M. Mitchell, Deceased,

        Plaintiff - Appellee,

    v.

DEBRA K. FERGUSON, Licensed Clinical Psychologist,

        Defendant - Appellant,

    and

NAPHCARE, INC.; NSEKENENE KOLONGO, MD; RENEE EDWARDS, LCSW; JUSTIN RAY, NP-PSYCH; BENEDICT NGWA, NP; PAM JOHNSON, RN; NATALYA THOMAS, RN, HSA; JALESSA RIVERS, LPN; HOPE NICHOLSON, MA; DORIS MURPHY, MSW; JOHN/JANE DOE, (1-11) Naphcare Nurses; KELLY N. BOYD; HAMPTON ROADS REGIONAL JAIL AUTHORITY; HAMPTON ROADS REGIONAL JAIL; DAVID L. SIMONS; EUGENE TAYLOR, III; BARNES, Correctional Officer at the Hampton Roads Regional Jail; BLAKELY, Correctional Officer at the Hampton Roads Regional Jail; BOURNE, Correctional Officer at the Hampton Roads Regional Jail; BUTCHER, Correctional Officer at the Hampton Roads Regional Jail; GIBBS, Correctional Officer at the Hampton Roads Regional Jail; HILLIARD, Correctional Officer at the Hampton Roads Regional Jail; HOWARD, Correctional Officer at the Hampton Roads Regional Jail; KEISTER, Correctional Officer at the Hampton Roads Regional Jail; WHITAKER, Correctional Officer at the Hampton Roads Regional Jail; POWELL, Correctional Officer at the Hampton Roads Regional Jail; SMITH, Master Jail Officers "MJOs" at Hampton Roads Regional Jail; DIXON, Master Jail Officers "MJOs" at Hampton Roads Regional Jail; JOHNSON, Master Jail Officers "MJOs" at Hampton Roads Regional Jail; DERRICK R. BROWN, Sergeant at the Hampton Roads Regional Jail; STEPHEN T. PHILLIPS, Sergeant at the Hampton Roads Regional Jail; WILLIAM A. EPPERSON, Sergeant at the Hampton Roads Regional Jail; STEVEN W.

WHITEHEAD, Sergeant at the Hampton Roads Regional Jail; TAMARA L. EVERETTE, Sergeant at the Hampton Roads Regional Jail; RODERICK D. MADISON, Lieutenant at the Hampton Roads Regional Jail; REGINALD WHITEHEAD, Sergeant at the Hampton Roads Regional Jail; FELICIA M. COWAN, Captain at the Hampton Roads Regional Jail; GAIL HART,

Defendants.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. Rebecca Beach Smith, Chief District Judge. (2:16-cv-00229-RBS-LRL)

———————

Argued: December 5, 2017      Decided: March 6, 2018

———————

Before GREGORY, Chief Judge, and MOTZ and TRAXLER, Circuit Judges.

———————

Affirmed in part, reversed in part, and remanded by published opinion. Judge Motz wrote the opinion, in which Chief Judge Gregory and Judge Traxler joined.

———————

**ARGUED:** David Patrick Corrigan, HARMAN CLAYTOR CORRIGAN & WELLMAN, P.C., Glen Allen, Virginia, for Appellant. John Frederick Preis, Henrico, Virginia, for Appellee. **ON BRIEF:** Jeremy D. Capps, M. Scott Fisher, Jr., HARMAN CLAYTOR CORRIGAN & WELLMAN, P.C., Glen Allen, Virginia, for Appellant. Mark J. Krudys, THE KRUDYS LAW FIRM, PLC, Richmond, Virginia, for Appellee.

———————

2

DIANA GRIBBON MOTZ, Circuit Judge:

This case arises from the events surrounding the death of Jamycheal Mitchell. His personal representative, Roxanne Adams, brought this action on his behalf, asserting claims under 42 U.S.C. § 1983 and state law against Debra K. Ferguson and forty-nine other defendants. Ferguson moved to dismiss all claims against her; the district court denied the motion. Ferguson appeals. For the reasons that follow, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.

Because this case comes to us after denial of a motion to dismiss, we "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam).

A.

Police arrested Jamycheal Mitchell in April 2015 for theft. Because Mitchell had a history of mental health issues and displayed "agitated behavior, elevated and irritable mood," and had "delusions," a state court judge ordered a competency evaluation. That evaluation found that Mitchell "was an appropriate candidate for the [state's] Jail Diversion Program." Mitchell, however, "refuse[d] to accept [those] services." As a result, instead of transferring Mitchell to a mental health facility, the state sent him to Hampton Roads Regional Jail ("the Regional Jail").

While at the Regional Jail, a psychologist again evaluated Mitchell and found him "both manic and psychotic." The psychologist concluded that Mitchell "lacked the

3

capacity to assist counsel in preparing a defense" and "urged" the court "to commit Mitchell to the Department of Behavioral Health [& Developmental Services] for inpatient treatment to restore his competency." The state court accordingly issued a Competency Restoration Order ("Competency Order"), which, "in an effort to restore him to competency," directed that Mitchell "be treated at Eastern State Hospital" ("the Hospital").

Mitchell never received such treatment. The clerk of the court did not notify the Hospital of Mitchell's Competency Order for two months. When the Hospital did receive the Competency Order, the person responsible for processing it "put the fax [containing the Competency Order] in her desk drawer and took no further action." As a result, no one ever entered Mitchell's name into the list of individuals waiting for beds at the Hospital. Instead, Mitchell remained at the Regional Jail, where he did not receive necessary medical care and guards denied him food and water, allowed him to live in a cell covered by feces and urine, and physically abused him.

On August 19, 2015, Mitchell died from "wasting syndrome" or severe malnutrition. Months after Mitchell's death, the Office of the State Inspector General reported that the Hospital almost never operated at capacity, and that state-wide, there were more empty beds available at state mental hospitals than there were inmates waiting for beds.

4

B.

During these events, Debra K. Ferguson served as the Commissioner of the Virginia Department of Behavioral Health & Developmental Services, the agency responsible for overseeing state mental health hospitals.

Adams alleges that Ferguson "had a statutory duty . . . to transfer Mitchell and other incompetent individuals to appropriate hospitals and to provide them restorative inpatient health care."  Instead, Ferguson "deliberately failed to comply with [the Competency Order] concerning Mitchell, thus impeding Mitchell's access to adequate medical care."  Accordingly, Adams sued Ferguson under Virginia law for "negligence, gross negligence, and willful and wanton negligence," and under § 1983 for constitutional violations resulting from "denial, delay, and withholding of medical care"; "deprivation of civil rights"; and "deliberate indifference."

C.

Ferguson moved to dismiss all counts against her, claiming sovereign immunity, qualified immunity, and that the complaint did not state a claim under § 1983 or state law.  The district court referred the matter to a magistrate judge, who recommended dismissal of all claims alleged against Ferguson.  Adams objected to that recommendation, and on *de novo* review, the district court denied Ferguson's motion to dismiss in its entirety.  The court found that neither sovereign nor qualified immunity protected Ferguson from suit and that Adams had sufficiently pled all of her claims against Ferguson.  This appeal followed.

5

II.

Before we can address the substantive issues in this case, we must first determine whether we have jurisdiction.

In general, we have jurisdiction only to review final judgments. *See* 28 U.S.C. § 1291. Thus, we ordinarily lack jurisdiction to hear an appeal from the denial of a motion to dismiss. *See Suarez Corp. Indus. v. McGraw*, 125 F.3d 222, 225 (4th Cir. 1997). One exception to this general rule is the collateral order doctrine. That doctrine permits appellate review of a "small class" of orders "that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (internal quotation marks and citations omitted).

The collateral order doctrine has long been held to provide a basis for appellate jurisdiction over orders refusing to dismiss § 1983 claims against officials claiming sovereign or qualified immunity from suit. *See Jenkins v. Medford*, 119 F.3d 1156, 1159 (4th Cir. 1997) (en banc); *Suarez*, 125 F.3d at 226; *see also Mitchell v. Forsyth*, 472 U.S. 511, 525, 530 (1985). Thus, pursuant to the collateral order doctrine, we have jurisdiction over Ferguson's claimed immunity defenses to Adams's § 1983 claims.

Ferguson contends that the collateral order doctrine also grants us jurisdiction to review the district court's decision not to dismiss the state law claims asserted against her. In her reply brief, she maintains that this is so because the Virginia "public duty doctrine . . . affords public officials immunity from suit" under state law. Appellant Reply Br. at 16. This argument fails. As an initial matter, Ferguson has waived the right

6

to assert this argument. In moving to dismiss her state law claims, she maintained only that she was "entitled to sovereign immunity"; she did not mention the public duty doctrine. *See Castendet-Lewis v. Sessions*, 855 F.3d 253, 259 (4th Cir. 2017). Moreover, it is not at all clear that the "public duty doctrine" constitutes an immunity from suit. As Ferguson herself admits, the Supreme Court of Virginia has never so held. Appellant Reply Br. at 19.

Alternatively, Ferguson maintains that we have pendent jurisdiction to review the sufficiency of Adams's state law claims. Appellant Reply Br. at 20–21. But "pendent appellate jurisdiction is available only (1) when an issue is 'inextricably intertwined' with a question that is the proper subject of an immediate appeal; or (2) when review of a jurisdictionally insufficient issue is 'necessary to ensure meaningful review' of an immediately appealable issue." *Rux v. Republic of Sudan*, 461 F.3d 461, 475 (4th Cir. 2006) (quoting *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 51 (1995)). Whether Ferguson owed Mitchell a duty under state negligence law is neither "inextricably intertwined" with the question of whether Ferguson owed Mitchell a duty under the United States Constitution, nor is it "necessary" to resolve these state law issues to "ensure meaningful review" of Ferguson's claimed federal constitutional immunities.

We therefore lack jurisdiction to review the district court's denial of Ferguson's motion to dismiss Adams's state law claims and remand those claims to the district court.

III.

We next turn to Ferguson's assertion that the Eleventh Amendment provides her with absolute immunity from suit. "We review questions of the applicability of Eleventh Amendment immunity *de novo*." *Harter v. Vernon*, 101 F.3d 334, 336–37 (4th Cir. 1996); *accord, e.g.*, *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 332 (4th Cir. 2008).

The Eleventh Amendment immunizes states from suits seeking money damages. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985). This immunity also applies to "judgment[s] against a public servant in his official capacity." *See Brandon v. Holt*, 469 U.S. 464, 471–72 (1985) (internal quotation marks omitted). This is so because such suits against state officers "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). In contrast, the Eleventh Amendment does not bar "an award of damages against an official in his personal capacity [that] can be executed only against the official's personal asserts." *Graham*, 473 U.S. at 166.

The Supreme Court has clarified that this capacity-based distinction is "best understood as a reference to the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury." *Hafer v. Melo*, 502 U.S. 21, 26 (1991). Thus, we begin by examining the complaint. *See id.* at 24 n.*.

Adams's complaint clearly states that "Defendant Ferguson is sued in her individual capacity." Of course, "the mere incantation of the term 'individual capacity' is not enough to transform an official capacity action into an individual capacity action." *Lizzi v. Alexander*, 255 F.3d 128, 137 (4th Cir. 2001), *overruled in part on other grounds*

8

*by Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721 (2003). But nothing in the remainder of the complaint, or in the record, undermines Adams's clear statement that this is a personal-capacity, rather than official-capacity, suit.

In fact, the complaint seeks to recover damages only from Ferguson herself and makes no mention of relief from the state. *See Edelman v. Jordan*, 415 U.S. 651, 668 (1974) (noting that the Eleventh Amendment bars suits where the relief sought necessarily "requires payment of state funds"). Moreover, the complaint asserts claims against Ferguson, rather than the current Commissioner. *See Graham*, 473 U.S. at 166 n.11 ("In an official-capacity action in federal court, death or replacement of the named official will result in automatic substitution of the official's successor in office."); Va. Dep't of Behavioral Health & Developmental Servs., *Commissioner Bio*, http://www.dbhds.virginia.gov/about-dbhds/commissioner-bio (last visited Jan. 10, 2018) (stating interim Commissioner was appointed in September 2015, nine months before Adams filed her complaint). Given all of the facts, it is clear that Adams sued Ferguson in her individual capacity. *Cf. Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 543 (1986) (finding that even where complaint said "individual and official capacities" but nothing in the record or complaint supported suggestion that plaintiff sought relief against defendants in their individual capacities, the complaint was not a personal-capacity suit (internal quotation marks omitted)).

Ferguson relies on *Martin v. Wood*, 772 F.3d 192 (4th Cir. 2014) to resist this conclusion. In *Martin*, we laid out a five-factor inquiry to "identify the real, substantial party in interest" in suits alleging violations of the Fair Labor Standard Act ("FLSA").

9

*Id.* at 196. Those factors focus on the connection between the officer's conduct and his official duties, his interests and the state's interests, and his authority and the state's authority. *See id.* This makes sense in the context of the FLSA, as "Congress manifested a desire to exclusively define the private remedies available to redress violations of" that statute. *Kendall v. City of Chesapeake*, 174 F.3d 437, 443 (4th Cir. 1999). But Congress enacted § 1983 to give private litigants a mechanism to "enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity." *Hafer*, 502 U.S. at 28 (internal quotation marks and citation omitted). Applying the *Martin* factors, which focus on the official character of the defendant's actions, to § 1983 claims would "absolutely immunize state officials from personal liability for acts within their authority and necessary to fulfilling governmental responsibilities." *Hafer*, 502 U.S. at 28. We refuse to apply to § 1983 claims these factors, which we articulated for use in considering claims under a very different statute, and which would undermine the very purpose of § 1983.

Adams sued Ferguson in her personal capacity and seeks to recover only from her, not from the Commonwealth of Virginia. Eleventh Amendment absolute immunity does not bar the suit.

IV.

Ferguson next argues that even if she is not absolutely immune from suit on the § 1983 claims, she is entitled to qualified immunity. We review qualified immunity

10

determinations *de novo*.  *Jenkins*, 119 F.3d at 1159; *see Elder v. Holloway*, 510 U.S. 510, 516 (1994).

A.

Qualified immunity "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  To overcome this shield, a plaintiff must demonstrate that:  (1) the defendant violated the plaintiff's constitutional rights, and (2) the right in question was clearly established at the time of the alleged violation.  *See id.*

The Supreme Court previously required courts to address the first prong before the second.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).  In 2009, however, the Court held that judges "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson*, 555 U.S. at 236.  Thus, we now can "skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case."  *See id.* at 232, 236 (quoting *Saucier*, 533 U.S. at 201) (internal quotation marks omitted).  We do so here.

"Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery."  *Mitchell*, 472 U.S. at 526.  "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that

11

what he [or she] is doing violates that right.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Reichle*, 566 U.S. at 664 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Of course, "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), as "when extreme though unheard-of actions violate the Constitution," *Camreta v. Greene*, 563 U.S. 692, 728 (2011). But the law must be "'sufficiently clear' [such] that every 'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Id.* at 742; *see White v. Pauly*, 137 S. Ct. 548, 551–52 (2017) (per curiam); *City and Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1774 n.3 (2015). Thus, we consider whether a right is clearly established "in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 136 S. Ct. at 308 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)) (internal quotation marks omitted). For example, in *Taylor v. Barkes*, 135 S. Ct. 2042 (2015) (per curiam), the Court found that two cases holding that "officials who know of an inmate's particular vulnerability to suicide must not be recklessly indifferent to that vulnerability" did not clearly establish that "an incarcerated individual had an Eighth Amendment right to the proper implementation of adequate suicide prevention protocols." *Id.* at 2044–45 (internal quotation marks and citation omitted).

With these principles in mind, we turn to the case at hand.

B.

Adams contends that by August 2015, it was clearly established that "an officer in charge of a state hospital system [who] knows that the system has a pervasive problem with waiting lists and empty beds, and . . . that numerous persons entitled to state beds, if denied help, face[d] a substantial risk of suffering serious harm, [could not] decline to intervene[.]" Appellee Br. at 44–45. As support for her claim, Adams relies on three cases: *Farmer v. Brennan*, 511 U.S. 825 (1994); *Iko v. Shreve*, 535 F.3d 225 (4th Cir. 2008); and *Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984).

In *Farmer*, the Supreme Court addressed the showing necessary to prove that a defendant violated the Eighth Amendment in its treatment of an inmate's medical needs. 511 U.S. 825. The Court held that this requires proof that the medical need in question is objectively "serious," and that the defendant acted with subjective indifference, meaning he or she "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Id.* at 834, 837.

In *Iko*, we defined a "serious medical need" as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)); *accord Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). We concluded that where an inmate collapsed and did not respond after officers covered the inmate's face and mouth with a "spit mask" and

13

sprayed him with significant amounts of pepper spray, "even a lay person" would have known that the inmate required medical attention. *Iko*, 535 F.3d at 230–33, 241.

Finally in *Slakan*, we held that the routine use of water hoses and tear gas against inmates in locked, individual cells "crossed the line separating necessary force from brutality." 737 F.2d at 372. Moreover, we concluded that the inmate plaintiff produced ample evidence that the Secretary of Corrections, "an administrator with direct statutory responsibility for prescribing the operating rules" for his department, "indisputably knew that water hosing was used as a routine control measure" in the state's prisons. *Id.* at 374–75. Accordingly, we denied the Secretary's claim for qualified immunity, explaining that the "natural and foreseeable consequence" of his "supervisory indifference" to, or "tacit authorization" of, this conduct "invited [constitutional] abuses" that caused the plaintiff's injuries. *See id.* at 372, 376.

*Farmer*, *Iko*, and *Slakan* undoubtedly lend support to some portions of Adams's claims against Ferguson. Phrased in Adams's language, *Farmer* made clear that a defendant acts with deliberate indifference when he or she "decline[s] to intervene" to prevent a "know[n] . . . substantial risk" to an inmate "of suffering serious harm." *See* Appellee Br. at 44–45; *Farmer*, 511 U.S. at 834, 837. Although *Iko* dealt with a physical ailment, it is no great stretch to conclude that it clearly established that someone "that has been diagnosed by a physician" with a mental health issue that "mandat[es] treatment" also has a serious medical need. *See Iko*, 535 F.3d at 241; *see also Jackson*, 775 F.3d at 178. The Virginia Competency Order scheme matches this definition of "serious medical need." State law provides that a court may not issue a Competency Order absent an

14

evaluation by a medical professional that concludes a defendant is in need of treatment. *See* Va. Code §§ 19.2-169.1, 19.2-169.2. In other words, a Virginia court may only issue a Competency Order if "it finds that a medical professional has concluded that medical care is mandated." Appellee Br. at 30. Finally, we found in *Slakan* that it was clearly established by 1979 that a cabinet officer's "continued inaction in the face of documented widespread [constitutional] abuses" by lower-level employees "provides an independent basis for" holding him liable for those abuses under § 1983. 737 F.2d at 373, 376–77.

*Farmer*, *Iko*, and *Slakan*, however, do not establish that failure to transfer an inmate from a prison to a state mental health facility creates "an excessive risk to inmate health or safety," *Farmer*, 511 U.S. at 837, or, as Adams claims, a "know[n] . . . substantial risk" that an inmate will "suffer[] serious harm," Appellee Br. at 44–45. This is true even with respect to an inmate subject to a Competency Order or equivalent court order directing treatment of the inmate's mental health needs. Adams has not identified any case law that holds that mentally ill prisoners housed in state prisons, including those subject to Competency Orders or the like, must be transferred to state mental health hospitals to escape an excessive risk to their health. Nor have we found any.

Virginia law requires prisons to provide mental health services to inmates. Va. Code § 53.1-32(A) ("It shall be the general purpose of the state correctional facilities to provide . . . medical and mental health care and treatment . . . ."). The Competency Order scheme presumes that inmates with serious mental health conditions are *more likely* to have their competency restored if they receive treatment at a state mental health hospital. *See* Va. Code § 19.2-169.2. But that does not mean that inmates with such conditions

15

who remain in Virginia's prison system are *per se* subject to an "excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837.

We are not blind to the fact that many prison systems offer inadequate mental health care. But we are unaware of any clearly established law (or indeed, any law at all) holding that prisons are, as a general rule, unfit to house mentally ill inmates. Instead, inmates regularly challenge, and judges regularly address, the provision of prison mental health services on a system-by-system, facility-by-facility, and prisoner-by-prisoner basis.[*]

Of course, in this case, the complaint alleges that prison officials affirmatively denied Mitchell his constitutional right to personal health and safety. It maintains that prison guards denied Mitchell food, turned off the water to his cell, and allowed him to live in a less-than-human state. Prison medical staff assertedly provided Mitchell little-to-no medication or treatment for severe mental and physical ailments. The complaint further alleges that guards forced Mitchell "to the ground, dragged, sprayed with mace, stood upon, punched and kicked" him, and that after he died, "a correctional officer employee . . . attempted to clean Mitchell's cell" to hide the evidence of this systemic

---

[*] *See, e.g.*, *Brown v. Plata*, 563 U.S. 493, 501–02 (2011) (inadequate mental health care in California prisons due to systemic overcrowding); *Scott v. Clarke*, 61 F. Supp. 3d 569, 583 (W.D. Va. 2014) (observing that "courts routinely certify class actions . . . challenging prison . . . mental health care" (citation and internal quotation marks omitted)); *Latson v. Clarke*, 249 F. Supp. 3d 838, 860–61 (W.D. Va. 2017) (finding plaintiff plausibly alleged that conditions of confinement deprived him of identifiable mental health needs); *see also Cano v. Taylor*, 739 F.3d 1214 (9th Cir. 2014); *Blackmon v. Sutton*, 734 F.3d 1237 (10th Cir. 2013); *Hallett v. Morgan*, 296 F.3d 732 (9th Cir. 2002).

16

mistreatment. Adams has brought suit against some forty-nine other defendants in an effort to hold them liable for this conduct. But these are not the claims alleged against Ferguson. In assessing whether she is entitled to qualified immunity, we must differentiate the claims made against other defendants from those asserted against her.

The Tenth Circuit recently undertook a similar analysis in *Blackmon v. Sutton*, 734 F.3d 1237 (10th Cir. 2013), which concerned the treatment of a juvenile in a detention facility. The court, in an opinion by then-Judge Gorsuch, denied qualified immunity for defendants who allegedly "shackled" the plaintiff to a restraining chair and allowed "a fully grown man . . . to sit on the [plaintiff's] chest" "simply . . . to punish him." *Id.* at 1242–44. It also denied qualified immunity for prison officials who "were well aware of" the plaintiff's "grave mental health problems" but "delayed or denied" the plaintiff's access to necessary medical care. *Id.* at 1244–46. But the *Blackmon* court rejected the claim that the director of the facility violated the plaintiff's constitutional rights by "failing to transfer him to" a less restrictive facility pending trial. *Id.* at 1246–47. The court reasoned that the plaintiff had not shown "that his placement in the juvenile detention facility *automatically and alone* amounted to an 'objectively excessive risk' to his health and safety." *Id.* at 1247 (emphasis added). Said differently, it was not clear that, absent the use of excessive force or denial of access to medical care, placing the plaintiff in the detention center and denying him a transfer *per se* violated the Constitution. The court therefore granted the director qualified immunity. *Id.*

The same is true here. Adams has alleged conduct by many other defendants that, if true, clearly violates the Constitution. But her claim against Ferguson turns on "five

17

words: 'waiting lists and empty beds.'" Appellee Br. at 2. Our qualified immunity analysis must therefore focus on this conduct, and this claim, alone: that — in her own words — it is clearly established that "plausible allegations of 'waiting lists and empty beds' state claims for relief" under § 1983. *Id.* We cannot hold that they do.

Time and again, the Supreme Court has reiterated that for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question *beyond debate*." *Taylor*, 135 S. Ct. at 2044 (emphasis added) (internal quotation marks and citations omitted); *see Pauly*, 137 S. Ct. at 551 (noting that "[i]n the last five years," the Supreme Court had "issued a number of opinions reversing" denials of qualified immunity (citing *Sheehan*, 135 S. Ct. at 1774 n.3, which collected cases doing so)). No clearly established law dictates that housing mentally ill inmates in prisons, rather than transferring them to state mental health facilities, "automatically and alone amount[s] to an 'objectively excessive risk' to [inmate] health and safety." *Blackmon*, 734 F.3d at 1247.

In light of repeated instruction from the Supreme Court, we must conclude that Ferguson is entitled to qualified immunity from suit on Adams's § 1983 claims.

V.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED IN PART, REVERSED IN PART,*
*AND REMANDED.*

18