**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-6417

MARION KATRELL CAMPBELL, on behalf of himself and all others similarly situated

                    Plaintiff – Appellee,

          v.

CHRIS FLORIAN; DAVID TATARSKY,

                    Defendants – Appellants,

          and

SOUTH CAROLINA DEPARTMENT OF CORRECTIONS; BRIAN P. STIRLING, Director of South Carolina Department of Corrections,

                    Defendants.

Appeal from the United States District Court for the District of South Carolina, at Greenville.  Mary G. Lewis, District Judge. (6:16-cv-03265-MGL-KFM)

Argued:  January 28, 2020                           Decided:  August 20, 2020
                              Amended:  August 28, 2020

Before NIEMEYER, AGEE, and RICHARDSON, Circuit Judges.

Reversed by published opinion.  Judge Richardson wrote the opinion, in which Judge Niemeyer and Judge Agee joined.

**ARGUED:** Charles Clifford Rollins, RICHARDSON PLOWDEN & ROBINSON, P.A., Columbia, South Carolina, for Appellants. Christopher P. Kenney, RICHARD A. HARPOOTLIAN P.A., Columbia, South Carolina, for Appellee. **ON BRIEF:** Eugene H. Matthews, RICHARDSON PLOWDEN & ROBINSON, P.A., Columbia, South Carolina, for Appellants. Richard A. Harpootlian, RICHARD A. HARPOOTLIAN P.A., Columbia, South Carolina; Charles W. Whetstone, Jr., Cheryl F. Perkins, WHETSTONE, PERKINS & FULDA, LLC, Columbia, South Carolina; Philip A. Berlinsky, BERLINSKY AND LING, LLC, North Charleston, South Carolina, for Appellee.

RICHARDSON, Circuit Judge:

This suit raises interesting questions about the liability of government attorneys when an agency adopts their legal interpretation, but a court later disagrees. According to lawyers for the South Carolina Department of Corrections ("SCDC"), state law required Marion Campbell to serve at least eighty-five percent of his drug-distribution sentence before he could be released. The South Carolina Administrative Law Court agreed; the South Carolina Court of Appeals did not. Based on the appeals court's ruling, the SCDC should have freed Campbell earlier than he was actually released based on the application of work and good-conduct credits.

After his release, Campbell filed this § 1983 suit. He asserts that the SCDC lawyers' analysis of South Carolina law was erroneous and violated the Eighth Amendment's prohibition on "cruel and unusual punishments" by prolonging his detention. But we find that qualified immunity shields the government attorneys. Assuming Campbell's continued detention falls within the ambit of the Eighth Amendment, the SCDC lawyers were not deliberately indifferent to his plight. So Campbell has failed to make out a constitutional violation, and his suit must be dismissed.

I.     Facts

On April 22, 2010, Marion Campbell was indicted in Colleton County, South Carolina for "manufacturing or distribution of cocaine base" (third offense). J.A. 26. And in December 2011, Campbell pleaded guilty to distribution of crack cocaine (second

3

offense) in violation of S.C. Code. § 44-53-375(B)(2). A South Carolina circuit court judge sentenced him to seven years' imprisonment.[1]

Yet, in South Carolina (as in the federal system), the imposition of a seven-year sentence does not necessarily mean the convicted will remain behind bars for seven years. As relevant here, South Carolina inmates may be entitled to apply work credits and good-time credits to the balance of their sentence. For every two days that an inmate works on a "productive duty assignment," he may receive a day's credit. § 24-13-230(A). And prisoners who "faithfully observed all the rules of the institution where [they are confined]," are granted good-time credits "at the rate of twenty days for each month served." § 24-13-210(A); *cf.* 18 U.S.C. § 3624(b) (governing federal good-time credits).

Although these credits may cut the time a prisoner spends behind bars, they do not apply to all South Carolina inmates without restriction. The South Carolina legislature has classified certain offenses as "no parole offenses." S.C. Code § 24-13-100. Prisoners convicted of these offenses must serve at least eighty-five percent of their sentence as imposed. § 24-13-150(A) ("Notwithstanding any other provision of law . . . an inmate convicted of a 'no parole offense' . . . is not eligible for early release, discharge, or community supervision . . . until the inmate has served at least eighty-five percent of the actual term of imprisonment imposed."); *see also* §§ 24-13-210(B), -230(B). As a result, an inmate's work and good-conduct credits do not kick in for "no parole offenders" until

---

[1] The judge also imposed a twenty-five-year suspended sentence and five years' probation. *See* § 24-21-410.

they have served eighty-five percent of their sentence. In South Carolina, this is known as the "eighty-five-percent rule."

This case arises from the SCDC's application of the "no parole offense" label to Campbell's conviction. When Campbell was indicted, his offense, § 44-53-375(B)(2), was classified as a "no parole offense." *See* § 24-13-100. But while Campbell's case proceeded, the South Carolina legislature enacted significant revisions to its criminal sentencing laws. On June 2, 2010, the Omnibus Crime Reduction and Sentencing Reform Act of 2010 ("Omnibus Act") took effect, and Sections 37 and 38 of the Omnibus Act appended the following paragraph to § 44-53-375(B):

> Notwithstanding any other provision of law, a person convicted and sentenced pursuant to this subsection for a first offense or second offense may have the sentence suspended and probation granted, and is eligible for parole, supervised furlough, community supervision, work release, work credits, education credits, and good conduct credits.

While the Omnibus Act amended § 44-53-375(B), it *did not* amend § 24-13-100, which controlled "no parole offense" classifications. Nor did the Omnibus Act amend § 24-13-150(A), which enumerates the consequences of the no-parole-offense designation. This created an arguable contradiction in South Carolina law: The Omnibus Act suggests that Campbell "is eligible for parole . . . work credits, education credits, and good conduct credits." § 44-53-375(B). But § 44-53-375(B) still fell within § 24-13-100's classification of "no parole offenses," and so the eighty-five-percent rule still precluded him from gaining

5

early release based on those credits. Compounding the confusion, both § 24-13-150(A) and § 44-53-375(B) claimed to apply "notwithstanding any other provision of law."[2]

To fulfill its responsibilities—including determining parole eligibility and calculating release dates based on earned credits—the SCDC needed to sort through the new law in all its contradictions. The task fell to Chris Florian, the SCDC's deputy general counsel. Florian pored over the South Carolina caselaw on statutory interpretation and legislative intent. And based on his review, he concluded that South Carolina law required the SCDC to adopt a legal interpretation that harmonized potentially contradictory provisions of a statute, if possible. *See, e.g.*, *Justice v. Pantry*, 496 S.E.2d 871, 874 (S.C. Ct. App. 1998) (citing *State v. Hood*, 188 S.E. 134, 136 (S.C. 1936)). Applying this principle, Florian drafted a memorandum describing how he believed the Omnibus Act should be interpreted.[3]

In his memo, Florian proceeded through the Omnibus Act section by section, and he summarized the changes that each section made. As for Sections 37 and 38 (amending S.C. Code § 44-53-375(B)), Florian concluded that an inmate convicted under § 44-53-375(B) was now *eligible* for parole. But if the inmate was not *granted* parole, the no-parole-offense restrictions—including the eighty-five-percent rule—would then apply:

---

[2] In 2015, the state again amended § 44-53-375(B). But since that amendment could not have affected the SCDC's legal interpretation in 2010, we set it aside.

[3] Florian also prepared other materials, such as a PowerPoint presentation, to teach the SCDC staff about the Omnibus Act. J.A. 89–104. But we see no need to review those documents. These other materials all stemmed from the legal interpretations in the Florian Memo, and the parties agree that this memorandum is the key document in this dispute. Appellants Br. 15–16; Appellee Br. 11.

Section 37 makes several changes to the structure of certain drug offenses. Affected offenses are now eligible for parole, supervised furlough, community supervision, and work release, despite the fact the some of the offenses affected are [classified as serious] felonies. As with many other sections of the Act, because nothing in the language of this section indicates the change applies retroactively, this change should only be applied to offenses occurring after June 2, 2010.

. . . [N]othing in the text of these sections directly addresses the issue of whether inmates convicted of these offenses are still required to serve 85% of their sentences before early release, discharge, or community supervision. Consequently, reading Sections 37 and 38 in conjunction with S.C. Code Ann.§ 24-13-150(A), [the "no parole offenses" section,] inmates convicted of these offenses are apparently still required to serve 85% of their sentences before release, unless they are granted parole. . . .

J.A. 222.

This interpretation, Florian believed, resolved the Omnibus Act's contradictions: By statutorily designating § 44-53-375(B) a "no parole offense," yet otherwise permitting "eligibility" for parole, the Omnibus Act gave the SCDC the discretion to parole certain inmates. But the Act did not remove the otherwise applicable general restrictions placed on a "no parole offense."

David Tatarsky, the SCDC's general counsel and Florian's boss, read the Florian Memo, familiarized himself with its contents, and approved it. The Florian Memo was then passed around the department and used to evaluate prisoners' eligibility for parole, credits, and release.

After the SCDC adopted the Florian Memo, an inmate named Michael Bolin challenged the department's interpretation of the Omnibus Act. Like Campbell, Bolin had been sentenced under § 44-53-375(B)(2). This offense, he claimed, was no longer subject to the eighty-five-percent rule and its consequences following the Omnibus Act

7

amendments.  Once he exhausted his options within the SCDC, Bolin marshalled his arguments before the South Carolina Administrative Law Court.  The Administrative Law Court endorsed Florian's interpretation of the Omnibus Act and dismissed Bolin's case. *Bolin v. South Carolina Dep't of Corrections*, No. 13-ALJ-04-0534-AP (S.C. Admin. Law Ct. Feb. 24, 2014).

Bolin then challenged the Administrative Law Court's decision in the South Carolina Court of Appeals.  Siding with Bolin, the appeals court held that an offense under § 44-53-375(B) is no longer a "no-parole offense."  *Bolin v. South Carolina Dep't of Corrections*, 781 S.E.2d 914, 916–17 (S.C. Ct. App. 2016).  The court acknowledged that the no-parole-offense designation in § 24-13-100 might be considered more specific than the amendment to § 44-53-375(B).  *See id.* at 917; *cf. Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996) ("[T]he specific governs the general.").  But the appeals court reasoned that the words, "notwithstanding any other provision of law," in § 44-53-375(B) expressed the "intent to repeal" any other provision, to the extent it conflicts.  *Bolin*, 781 S.E.2d at 917.  And the court believed that the Omnibus Act's amendments to § 44-53-375(B) would be "meaningless" if they did not "implicit[ly] repeal" the no-parole-offense designation in § 24-13-100.  *Id.* at 917.  Combined with the general intent to "conserve taxpayer dollars by allowing earlier release dates," the appeals court's analysis demanded Bolin's interpretation.  *Id.* at 918.  The SCDC did not appeal to the South Carolina Supreme Court.

Applying the *Bolin* interpretation, the SCDC re-calculated Campbell's release date, and it released Campbell in March 2016. At that point, Campbell had served about five years of his imposed seven-year sentence.[4]

After his release, Campbell filed the instant class action under 42 U.S.C. § 1983. Because the SCDC's initial interpretation of the Omnibus Act precluded the application of Campbell's good-time and work credits based on the eighty-five-percent rule, he was held longer than provided by law. Had those credits been applied as *Bolin* later required, Campbell would have been entitled to release about sixteen months *before* his actual release. *See* Appellee Br. 16; J.A. 39–40. According to Campbell, "[t]he decision by Florian, under the supervision and direction of Tatarsky, to continue detention of Plaintiff and the Class" violated the Eighth and the Fourteenth Amendments. J.A. 49.

At the summary judgment stage, Florian and Tatarsky asserted qualified immunity defenses. A magistrate judge thoughtfully rejected Campbell's Eighth Amendment claim, explaining that the evidence failed to show the subjective intent necessary for it to proceed. And in any event, the magistrate continued, any violation of law would not have been clearly established. So defendants were entitled to qualified immunity. The magistrate

---

[4] There is some confusion over the calculation of Campbell's time served and his "max out" date. *Compare* J.A. 39, *with* J.A. 287. But precision is unnecessary here. The record shows that Campbell was in prison longer than he should have been under the South Carolina Court of Appeals's interpretation of the Omnibus Act.

We also note there is uncertainty about whether the Omnibus Act applies "retroactively" to prisoners like Campbell. Florian thought not. *See* J.A. 222. But the SCDC later exercised its discretion to apply the Omnibus Act retroactively after the *Bolin* decision. J.A. 302–03. Although the retroactivity question may create a causation question, defendants have not raised it.

also reasoned that Campbell's claim did not fall within the Fourteenth Amendment's protection of a prisoner's liberty interest.  J.A. 491–92.

Campbell objected to the magistrate's report and recommendations.  J.A. 507−22. The district court agreed with the magistrate judge's analysis of the Fourteenth Amendment and thus granted defendants' motion for summary judgment on that claim.  But the court allowed Campbell's Eighth Amendment claim to proceed.  First, the district court declared that, "[g]iven the facts of this case, a jury might well find Florian's and Tatarsky's actions . . . amounted to deliberate indifference to a substantial risk of serious harm to Campbell." J.A. 565.  Second, the court reasoned that "it is both axiomatic and elementary that the plain meaning of the [Omnibus] Act, coupled with the legislature's intent, leads to the unmistakable conclusion the [Omnibus] Act transformed the no parole offenses . . . into parolable ones. . . . Florian and Tatarsky's interpretation of the [Omnibus] Act to the contrary was 'unreasonable' and their application of it was 'patently erroneous.'"  J.A. 569 (quoting *Bolin*, 781 S.E.2d at 916, 918).  Finding the meaning of the state law obvious, the district court explained that Campbell's Eighth Amendment right was, therefore, clearly established.  So Florian and Tatarsky were not entitled to qualified immunity.

The defendants timely appealed the district court's Eighth Amendment conclusions. We have jurisdiction over the district court's denial of qualified immunity.  *See* 28 U.S.C. § 1291; *Behrens v. Pelletier*, 516 U.S. 299, 307 (1996).

## II.    Discussion

In this appeal, we consider whether qualified immunity shields Florian and Tatarsky from the alleged Eighth Amendment violation.[5]  At the summary judgment stage, we take care to ensure all disputed facts and reasonable inferences are viewed in the light most favorable to the plaintiffs.  *See Calloway v. Lokey*, 948 F.3d 194, 201 (4th Cir. 2020).  We review the legal question of qualified immunity de novo.  *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018).

The qualified immunity inquiry has two steps.  First, the plaintiff must "make out a violation of a constitutional right."  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  Second, that right must be "clearly established" at the time of the alleged violation.  *Id.*  Although the Supreme Court has encouraged us to take these steps in sequential order, we retain the discretion to tread in the manner "that will best facilitate the fair and efficient disposition of each case."  *Id*. at 242.  Campbell's claim stumbles at the start.[6]

---

[5] Campbell brings his claim under 42 U.S.C. § 1983.  And under § 1983, a plaintiff must establish three elements: (1) the deprivation of a right secured by the constitution or a federal statute; (2) by a person; (3) acting under color of state law.  *West v. Atkins,* 487 U.S. 42, 48 (1988).

[6] Deciding this appeal on the first prong of the qualified immunity analysis follows the Supreme Court's guidance in *Johnson v. Jones*, 515 U.S. 304 (1995).  In *Johnson*, the Supreme Court held that, to the extent that the district court's order in a qualified immunity case rests on a sufficiency-of-the-evidence determination, that portion of an order lacks finality for an appeal.  *Id*. at 313.  So *Johnson* prevents us from exercising jurisdiction "over a claim that a plaintiff has not presented enough evidence to prove that the plaintiff's version of the events actually occurred."  *Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997) (en banc); *see also Iko v. Shreve*, 535 F.3d 225, 234–35 (4th Cir. 2008).  "[B]ut we [do] have jurisdiction over a claim that there was no violation of clearly established law accepting the facts as the district court viewed them."  *Winfield*, 106 F.3d at 530. (Continued)

Campbell bases his claim in the Eighth Amendment: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. In *Robinson v. California*, the Supreme Court applied the Eighth Amendment's final prohibition to the states through the Fourteenth Amendment. 370 U.S. 660, 667 (1962). Campbell invokes the Cruel and Unusual Punishments Clause when he argues that Florian and Tatarsky violated the Eighth Amendment by "prolong[ing] [his] detention." Appellee Br. 21.

To qualify as a cruel and unusual punishment implicating the Eighth Amendment, Campbell's claimed deprivations must satisfy "objective" and "subjective" requirements. *Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994). We consider each in turn.

A.      **Objectively serious**

To satisfy the "objective" component of an Eighth Amendment claim, the alleged deprivation must be "'sufficiently serious.'" *Porter v. Clarke*, 923 F.3d 348, 355 (4th Cir. 2019), *amended* (May 6, 2019) (quoting *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016)); *see also Farmer*, 511 U.S. at 834. The constitutional prohibition on cruel and unusual punishments was originally drafted "to proscribe 'tortures' and other 'barbar(ous)' methods of punishment." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quoting Anthony F.

---

Of course, where (as here), the district court "fails to supply the factual basis for its legal decision," this task is more difficult for us. *Id*. at 534; *see Johnson*, 515 U.S. at 319. And so we must determine "what the evidence, viewed in the light most favorable to the nonmoving party, demonstrated" to "render [our] decision on the purely legal issues." *Winfield*, 106 F.3d at 535.

12

Granucci, *Nor Cruel and Unusual Punishment Inflicted: The Original Meaning*, 57 CAL. L. REV. 839, 842 (1969)).  But over the years, the Supreme Court has imbued the Eighth Amendment with a more expansive meaning, holding it to bar punishments "incompatible with 'the evolving standards of decency that mark the progress of a maturing society,'" or which "'involve the unnecessary and wanton infliction of pain.'" *Id.* at 102–03 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). So to be "'sufficiently serious,'" we have held that a deprivation must prove "'extreme'"— thus posing either "'a serious or significant physical or emotional injury resulting from the challenged conditions,' or 'a substantial risk of such serious harm.'" *Scinto*, 841 F.3d at 225 (quoting *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003)).

Within this framework, for instance, we have recognized that the Eighth Amendment bars inhumane "conditions of confinement"—such as depriving an inmate of "adequate food, clothing, shelter, and medical care." *Farmer*, 511 U.S. at 832.  Just last year, our Court determined that solitary confinement of a death-row prisoner for 23 to 24 hours every day in a 71-square-foot cell—without access to religious, educational, or social programming—created such a risk of severe psychological harm that those conditions amounted to an objective Eighth Amendment violation. *Porter*, 923 F.3d at 357.  And in 2012, the Supreme Court held that mandatory life-without-parole sentences for juveniles are so disproportionate as to amount to cruel and unusual punishment. *Miller v. Alabama*,

13

567 U.S. 460, 479 (2012). These kinds of objectively extreme deprivations, the Eighth Amendment prohibits.

Although the parties focus their arguments on whether the defendants were deliberately indifferent, we first note that Campbell's claim does not fit neatly within the ambit of the Eighth Amendment. As one district court succinctly noted, although "the Fourth Circuit has never squarely addressed the issue of whether prolonged detention . . . amounts to a constitutional violation[,] . . . other circuits have recognized the Fourteenth Amendment due process right to be free from continued detention." *Johnson v. Hammett*, No. Civ. ELH-18-1059, 2019 WL 7185559, at \*14 (D. Md. Dec. 23, 2019).[7] Indeed, the heart of Campbell's suit here is that the SCDC failed to properly apply work and good-conduct credits. And claims of this nature have generally been assessed by the Supreme Court under the Fourteenth Amendment, not the Eighth. *See, e.g.*, *Board of Pardons v. Allen*, 482 U.S. 369, 376 (1987); *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974); *see also Howard v. South Carolina Dep't of Corrections*, 733 S.E.2d 211, 216–17 (S.C. 2012); *Vann v. Angelone*, 73 F.3d 519, 522 (4th Cir. 1996).

---

[7] *Compare Sample v. Diecks*, 885 F.2d 1099, 1108 (3d Cir. 1989) (holding that imprisonment beyond a duly imposed sentence based on a clerk's deliberate indifference is cruel and unusual punishment) *and Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985) (en banc) (same), *with Nelson v. Stalder*, 31 F. App'x 836, \*1–2 (5th Cir. 2002) (unpublished) (disagreeing with *Sample* and analyzing extended detention under the Due Process clause).

In one of our unpublished decisions, we recognized that "[i]ncarceration beyond the termination of one's sentence may state a claim under the due process clause and the [E]ighth [A]mendment." *Golson v. Dep't of Corrections*, 914 F.2d 1491, 1990 WL 141470, at \*1 (4th Cir. 1990). But the word "may" was crucial: even if prolonged detention violated the constitution, the plaintiff's evidence failed to support his claim.

14

In any event, we need not decide this question today. Assuming a sufficiently serious Eighth Amendment deprivation that satisfies the objective component, Campbell's evidence fails to satisfy the Eighth Amendment's subjective requirements.

## B.    Subjectively reckless

Under the subjective prong, a plaintiff must show that the defendant possessed a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). "[O]bduracy and wantonness, not inadvertence or error in good faith, [] characterize the conduct prohibited by the Cruel and Unusual Punishments clause." *Id.* at 299 (emphasis omitted). Thus, to make out an Eighth Amendment violation, the Supreme Court requires that a plaintiff show that state officials were "deliberate[ly] indifferent" to his plight. *Farmer*, 511 U.S. at 834; *Anderson*, 877 F.3d at 543.

"[D]eliberate indifference" is a form of *mens rea* (or "guilty mind") equivalent to criminal-law recklessness. *Farmer*, 511 U.S. at 839–40. In our Circuit, liability under this standard requires two showings: "[T]he prison official must have both 'subjectively recognized a risk of substantial harm' and 'subjectively recognized that his actions were inappropriate in light of that risk.'" *Anderson*, 877 F.3d at 545 (emphasis omitted) (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (Opinion of Williams, J.)); *see also Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016); *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997).[8] Thus, "[d]eliberate indifference is a very high standard," and "a

---

[8] In *Sample*, the Third Circuit described deliberate indifference similarly, though in three parts rather than two. 885 F.2d at 1110. Seizing on language in *Sample*, Campbell's argument suggests only one subjective showing must be made. Even if this were the law (Continued)

15

showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle*, 429 U.S. at 105–06).

Here, Florian and Tatarsky recognized that the Omnibus Act could significantly impact prisoners' sentences and liberty. *See, e.g.*, J.A. 172 (Florian noting the "issues of great significance" created by the Act affecting the "constitutional rights of liberty"); J.A. 203 (Tatarsky acknowledging that the Omnibus Act "was a significant bill for purposes of sentencing."). But "[i]mportantly, a prison official 'who actually knows of a substantial risk . . . may be found free from liability if [he] responded reasonably to the risk, even if the harm ultimately was not averted.'" *Short v. Smoot*, 436 F.3d 422, 427 (4th Cir. 2006) (quoting *Farmer*, 511 U.S. at 844); *see also Brown v. Harris*, 240 F.3d 383, 389 (4th Cir. 2001). In such a situation, it cannot be said that the official was deliberately indifferent. Accordingly, one predicate question is whether Florian and Tatarsky even acted inappropriately given that risk, let alone subjectively recognized the inappropriateness of their actions.

### 1. Florian acted reasonably

Simply put, the record shows that Florian acted reasonably to confront the interpretive problem before him. *See Farmer*, 511 U.S. at 845 ("[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause."). Indeed, Florian approached the relevant statutory-interpretation questions as a careful attorney would. Florian started by "reading the act itself," J.A. 83, commonly accepted as

of the Third Circuit, it is not ours. Our precedents make abundantly clear that deliberate indifference requires two subjective showings.

16

the first rule of statutory interpretation. *See Berkebile v. Outen*, 426 S.E.2d 760, 763 (S.C. 1993) ("We can not construe a statute without regard to its plain and ordinary meaning."); *accord Marx v. General Revenue Corp.*, 568 U.S. 371, 376 (2013); *cf.* Henry J. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes*, in BENCHMARKS 196, 202 (1967) (recalling Justice Frankfurter's three rules of statutory interpretation: "(1) [r]ead the statute; (2) read the statute; (3) read the statute!"). Florian then set to "outlining" the Omnibus Act's some sixty to ninety pages to determine which sections impacted the SCDC. J.A. 83. He "pull[ed] the existing statutes that the Omnibus Act would have impacted and review[ed] those." J.A. 84. Florian next "reviewed some case law on statutory construction"—"familiar territory" from his previous position as a staff attorney for the South Carolina Supreme Court. J.A. 84; *see also id.* at 176. And this review included "cases on legislative intent." J.A. 85.

In the process, Florian recognized that the new Omnibus Act was inconsistent. "At times," Florian noted, "the law seemed to be intending to reduce inmate sentences, but [in] other places you would see it actually increasing penalties." J.A. 87. And when Florian saw inconsistencies, he focused "on interpreting . . . each provision of the statute and understanding it in . . . context." J.A. 87. So, at first glance, the record suggests that Florian appropriately employed the normal tools of statutory construction to give his best interpretation to the new act. One court agreed with his conclusion. *Bolin*, No. 13-ALJ-04-0534-AP, at 4. Another did not. *Bolin*, 781 S.E.2d at 916−19.

Campbell advances two arguments for why Florian was deliberately indifferent. First, Campbell argues that the *Bolin* decision itself justifies an inference of criminal-law

17

recklessness. Appellee Br. 27–28. Second, he argues that Florian should have done more to interpret the law correctly—namely, deferring to outside experts. Appellee Br. 28–29. Both arguments fail as a matter of law.

### (a)    The *Bolin* Decision

Campbell first argues that the *Bolin* decision itself supports an inference of deliberate indifference:

> [T]he Florian Memo is not a reasonable reading of the Act. This is not a matter of conjecture or debate, but a settled matter of law as the South Carolina Court of Appeals found it to be "unreasonable" and to have "ignore[d] the purpose of the Act" it sought to construe.

Appellants Br. 27 (quoting *Bolin*, 781 S.E.2d at 918). In Campbell's view, the fact that the South Carolina Court of Appeals found Florian's conclusion to be unreasonable suggests that Florian must have acted with deliberate indifference. In effect, Campbell makes a *res ipsa loquitur* argument—that is, coming to an "unreasonable" legal determination is the kind of thing that does not happen without deliberate indifference.

There are several problems with Campbell's logical leap. *Res ipsa loquitur*—"the thing speaks for itself"—is a tort doctrine that *permits*, but ordinarily does not *compel*, a fact finder to infer negligence from the mere occurrence of a bad outcome. *See Stillman v. Norfolk & Western Railway Co.*, 811 F.2d 834, 837 (4th Cir. 1987) (citing *Jesionowski v. Boston & M.R.R.*, 329 U.S. 452, 457 (1947)). It serves as an exception to the "general rule" that "mere proof of an 'accident' . . . does not raise any presumption of negligence." *Sweeney v. Erving*, 228 U.S. 233, 238 (1913). *Res ipsa loquitur* has strict requirements, one of which is that the bad outcome does not ordinarily occur without some negligent act

18

or omission. *See Stillman*, 811 F.2d at 836. As a matter of law, only in this narrow class of cases will the doctrine permit an inference of negligence. *See id.* at 836–37. And, of course, if an inference of negligence is impermissible, neither is one of criminal recklessness. *See Grayson*, 195 F.3d at 695.

Even if the *res ipsa loquitor* doctrine can be applied here, it fails. An incorrect legal opinion often occurs without some negligent (much less reckless) act or omission. In our adversarial legal system, roughly 50% of litigants lose—and thus have pressed an incorrect legal opinion. Competent administrative agencies and lower courts are often overturned despite careful and thoughtful legal interpretations. Indeed, the South Carolina Administrative Law Court (an independent body) first upheld Florian's reading of the Omnibus Act. And even at the highest levels of the law, four colleagues at times share an "incorrect" or "unreasonable" opinion. *See* Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 HARV. L. REV. 2118, n.4 (2016) (listing recent "divides in statutory interpretation cases"). An unreasonable outcome in that context cannot support an inference that the dissenters were negligent or criminally reckless in their analysis.

In sum, Campbell asks us to infer criminal recklessness from a legal conclusion later deemed unreasonable. We cannot. That the South Carolina Court of Appeals reached a different statutory interpretation than Florian does not make out a violation of the Eighth Amendment.

### (b)     Whether "more" should have been done

Campbell also argues that Florian should have done "more" to have assured that his interpretation was correct. Appellee Br. 29; *see Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir.

2016) ("'[A] factfinder may conclude that the official's response to a perceived risk was so patently inadequate as to justify an inference that the official actually recognized that his response to the risk was inappropriate under the circumstances.'") (quoting *Parrish ex rel. Lee*, 372 F.3d at 303). Campbell's argument, however, suffers from a fundamental flaw: It identifies no obvious additional acts that Florian should (or even could) have taken.

Campbell focuses his argument on the assertion that the SCDC should have turned to outside sources to interpret the law. His expert—an instructor of Criminal Justice at the University of South Carolina Upstate—suggested that Florian should have "looked for somebody else to say that's right, your decision is correct." J.A. 442. According to the expert, Florian could have done so either (a) by getting a declaratory judgment from a court confirming his interpretation or (b) by asking someone outside the SCDC (either the Attorney General or an outside law firm). J.A. 439.

We are not persuaded. First, as Campbell's expert acknowledges, he could not identify anyone who could have acted as a proper opposing party for a declaratory judgment action under South Carolina law. *See* J.A. 118; *accord* J.A. 86 (Florian explaining that a declaratory judgment was not "a realistic option . . . you would need such things as an opposing party to have a case in court; you'd need an active controversy with that party to have standing . . . .").[9] Second, as Campbell's expert also acknowledged, no one else—either at the Attorney General's office or a private firm—had a greater expertise

---

[9] The expert later suggested that Florian could have gone to a South Carolina court and requested appointment of counsel to argue against his interpretation. J.A. 439. Even assuming this was possible, we do not consider it to be an obvious strategy that would support a reasonable inference that Florian acted with deliberate indifference.

in sentencing law. *See* J.A. 117–18. In fact, Florian was "the office's subject matter expert in sentencing law." J.A. 81; *see also* J.A. 85 ("We were the attorneys for the Department of Corrections, and we construed sentencing law on a daily basis. There wasn't an outside authority we could turn to do our job for us."). Thus, we do not believe it was reckless for the SCDC to rely on its own expertise. Quite the opposite—it may have been unreasonable for Florian to defer to someone less qualified. Campbell's bare assertion that Florian should have "done something more"—particularly without identifying plausible alternatives—cannot show that Florian's response was unreasonable, much less so "patently inadequate" as to support an inference of deliberate indifference. *Parrish ex rel. Lee*, 372 F.3d at 303.

Moreover, the implications of Campbell's argument give us pause. All parties recognized that the SCDC was the foremost authority on South Carolina's sentencing law. As a result, the SCDC was in the best position to bring its expertise to bear, and the state has thus empowered it to implement reasonable interpretations of the law. *See generally Kiawah Development Partners, II v. South Carolina Dep't of Health & Environmental Control*, 766 S.E.2d 707 (S.C. 2014). And, since legislatures rarely draft statutes as clearly as courts would like, statutory interpretation is often subject to some uncertainty (sometimes by design). *See* Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 31–33 (2012). Campbell's argument would require administrative agencies to abnegate their designated role in favor of courts or consultants whenever the agencies' interpretations potentially bear on a federal right. We see this requirement as unreasonable, particularly where aggrieved parties—like Michael Bolin—

21

have recourse to the agency and the courts to advance their preferred statutory interpretations.

In sum, we find that Florian acted reasonably when he interpreted the Omnibus Act—even though a court later disagreed. Campbell's arguments to the contrary fail as a matter of law. And so we hold that Campbell has failed to make out a violation of the Eighth Amendment.

## 2. Tatarsky did not act with deliberate indifference

Even if Florian's actions had violated Campbell's Eighth Amendment rights, Tatarsky cannot be held liable because of his "supervision and direction." J.A. 49. At times, "supervisory officials may be held liable . . . for the constitutional injuries inflicted by their subordinates." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). But that liability "is not premised upon *respondeat superior* but upon 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict.'" *Id*. (quoting *Slackan v. Porter*, 737 F.2d 368, 372–73 (4th Cir. 1984)). Supervisors are "obligated, when on notice of a subordinate's tendency to act outside the law, to take steps to prevent such activity. If a supervisory law officer is deliberately indifferent to that responsibility, he then bears some culpability for illegal conduct by his subordinates," and he may be held liable. *Randall v. Prince George's County, Maryland*, 302 F.3d 188, 203 (4th Cir. 2002).

Accordingly, a § 1983 plaintiff must show more than mere supervision. The supervisor's own response to the knowledge of a risk of constitutional injury must be "so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged

offensive practices.'" *Id.* (quoting *Shaw*, 13 F.3d at 799).  And ordinarily, the plaintiff "cannot satisfy [this] burden of proof by pointing to a single incident or isolated incidents . . . for a supervisor cannot be expected . . . to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct." *Slackan*, 737 F.2d at 373.

Campbell offers no evidence to make the required showing.  As Campbell acknowledges, "Tatarsky read the Florian Memo, familiarized himself with its contents, and signed off on it before it was disseminated throughout the department."  Appellee Br. 28.  Although Campbell argues that the "conclusory nature" of this review and "Tatarsky's inattention to it" supports a finding of deliberate indifference, Appellee Br. 28, this assertion does not make out a constitutional violation.  Tatarsky could rely on the good judgment of his subordinates until he had reason to believe otherwise.  But Campbell offers no evidence suggesting that Tatarsky had a "basis upon which to anticipate [Florian's] misconduct." *Slackan*, 737 F.2d at 373.[10]  And without grounds to suspect Florian's work, Tatarsky cannot be said to have acted with deliberate indifference when he approved Florian's memorandum.

\*          \*          \*

Since its proposal, the Eighth Amendment has been lauded as "express[ing] a great deal of humanity."  1 Annals of Cong. 754 (1789) (Joseph Gales, ed. 1834).  And while the

---

[10] Indeed, as discussed above, the record shows that Florian was the SCDC's "subject matter expert" on the issue.  J.A. 81.  And Campbell's expert agreed. *See* J.A. 117–18.

23

Amendment itself imposes a floor on permissible criminal punishments, it was hoped that the Legislature would, over time, invent "more lenient mode[s] of correcting vice and deterring others from the commission of it." *Id.* Through the Omnibus Act, the South Carolina legislature has sought to do that, and only time will tell the result.

The correct interpretation of the Omnibus Act has now been settled as a matter of state law—Florian and Tatarsky were wrong. But legal error alone is not deliberate indifference. As a result, Campbell fails to make out a violation of the Eighth Amendment. Florian and Tatarsky are thus entitled to qualified immunity, and Campbell's claim against them should be dismissed with prejudice. The judgment of the district court is

*REVERSED*.